## ROBINSON *v.* CALIFORNIA.

No. 554.   Argued April 17, 1962.—Decided June 25, 1962.

*Samuel Carter McMorris* argued the cause and filed briefs for appellant.

*William E. Doran* argued the cause for appellee.   With him on the brief were *Roger Arnebergh* and *Philip E. Grey.*

MR. JUSTICE STEWART delivered the opinion of the Court.

A California statute makes it a criminal offense for a person to "be addicted to the use of narcotics." [1]   This

[1] The statute is § 11721 of the California Health and Safety Code. It provides:

"No person shall use, or be under the influence of, or be addicted to the use of narcotics, excepting when administered by or under the direction of a person licensed by the State to prescribe and administer narcotics.   It shall be the burden of the defense to show that it comes within the exception.   Any person convicted of violating any provision of this section is guilty of a misdemeanor and shall be sentenced

appeal draws into question the constitutionality of that provision of the state law, as construed by the California courts in the present case.

The appellant was convicted after a jury trial in the Municipal Court of Los Angeles. The evidence against him was given by two Los Angeles police officers. Officer Brown testified that he had had occasion to examine the appellant's arms one evening on a street in Los Angeles some four months before the trial.[2] The officer testified that at that time he had observed "scar tissue and discoloration on the inside" of the appellant's right arm, and "what appeared to be numerous needle marks and a scab which was approximately three inches below the crook of the elbow" on the appellant's left arm. The officer also testified that the appellant under questioning had admitted to the occasional use of narcotics.

Officer Lindquist testified that he had examined the appellant the following morning in the Central Jail in Los Angeles. The officer stated that at that time he had observed discolorations and scabs on the appellant's arms,

---

to serve a term of not less than 90 days nor more than one year in the county jail. The court may place a person convicted hereunder on probation for a period not to exceed five years and shall in all cases in which probation is granted require as a condition thereof that such person be confined in the county jail for at least 90 days. In no event does the court have the power to absolve a person who violates this section from the obligation of spending at least 90 days in confinement in the county jail."

[2] At the trial the appellant, claiming that he had been the victim of an unconstitutional search and seizure, unsuccessfully objected to the admission of Officer Brown's testimony. That claim is also pressed here, but since we do not reach it there is no need to detail the circumstances which led to Officer Brown's examination of the appellant's person. Suffice it to say, that at the time the police first accosted the appellant, he was not engaging in illegal or irregular conduct of any kind, and the police had no reason to believe he had done so in the past.

and he identified photographs which had been taken of the appellant's arms shortly after his arrest the night before. Based upon more than ten years of experience as a member of the Narcotic Division of the Los Angeles Police Department, the witness gave his opinion that "these marks and the discoloration were the result of the injection of hypodermic needles into the tissue into the vein that was not sterile." He stated that the scabs were several days old at the time of his examination, and that the appellant was neither under the influence of narcotics nor suffering withdrawal symptoms at the time he saw him. This witness also testified that the appellant had admitted using narcotics in the past.

The appellant testified in his own behalf, denying the alleged conversations with the police officers and denying that he had ever used narcotics or been addicted to their use. He explained the marks on his arms as resulting from an allergic condition contracted during his military service. His testimony was corroborated by two witnesses.

The trial judge instructed the jury that the statute made it a misdemeanor for a person "either to use narcotics, or to be addicted to the use of narcotics . . . .[3] That portion of the statute referring to the 'use' of narcotics is based upon the 'act' of using. That portion of the statute referring to 'addicted to the use' of narcotics is based upon a condition or status. They are not identical. . . . To be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is

---

[3] The judge did not instruct the jury as to the meaning of the term "under the influence of" narcotics, having previously ruled that there was no evidence of a violation of that provision of the statute. See note 1, supra.

chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms. The existence of such a chronic condition may be ascertained from a single examination, if the characteristic reactions of that condition be found present."

The judge further instructed the jury that the appellant could be convicted under a general verdict if the jury agreed *either* that he was of the "status" *or* had committed the "act" denounced by the statute.[4] "All that the People must show is either that the defendant did use a narcotic in Los Angeles County, or that while in the City of Los Angeles he was addicted to the use of narcotics . . . ."[5]

Under these instructions the jury returned a verdict finding the appellant "guilty of the offense charged."

---

[4] "Where a statute such as that which defines the crime charged in this case denounces an act and a status or condition, either of which separately as well as collectively, constitute the criminal offense charged, an accusatory pleading which accuses the defendant of having committed the act and of being of the status or condition so denounced by the statute, is deemed supported if the proof shows that the defendant is guilty of any one or more of the offenses thus specified. However, it is important for you to keep in mind that, in order to convict a defendant in such a case, it is necessary that all of you agree as to the same particular act or status or condition found to have been committed or found to exist. It is not necessary that the particular act or status or condition so agreed upon be stated in the verdict."

[5] The instructions continued "and it is then up to the defendant to prove that the use, or of being addicted to the use of narcotics was administered by or under the direction of a person licensed by the State of California to prescribe and administer narcotics or at least to raise a reasonable doubt concerning the matter." No evidence, of course, had been offered in support of this affirmative defense, since the appellant had denied that he had used narcotics or been addicted to their use.

An appeal was taken to the Appellate Department of the Los Angeles County Superior Court, "the highest court of a State in which a decision could be had" in this case. 28 U. S. C. § 1257. See *Smith* v. *California,* 361 U. S. 147, 149; *Edwards* v. *California,* 314 U. S. 160, 171. Although expressing some doubt as to the constitutionality of "the crime of being a narcotic addict," the reviewing court in an unreported opinion affirmed the judgment of conviction, citing two of its own previous unreported decisions which had upheld the constitutionality of the statute.[6] We noted probable jurisdiction of this appeal, 368 U. S. 918, because it squarely presents the issue whether the statute as construed by the California courts in this case is repugnant to the Fourteenth Amendment of the Constitution.

The broad power of a State to regulate the narcotic drugs traffic within its borders is not here in issue. More than forty years ago, in *Whipple* v. *Martinson,* 256 U. S. 41, this Court explicitly recognized the validity of that power: "There can be no question of the authority of the State in the exercise of its police power to regulate the administration, sale, prescription and use of dangerous and habit-forming drugs . . . . The right to exercise this power is so manifest in the interest of the public health and welfare, that it is unnecessary to enter upon a discussion of it beyond saying that it is too firmly established to be successfully called in question." 256 U. S., at 45.

Such regulation, it can be assumed, could take a variety of valid forms. A State might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics within its borders. In the interest of discouraging the viola-

---

[6] The appellant tried unsuccessfully to secure habeas corpus relief in the District Court of Appeal and the California Supreme Court.

tion of such laws, or in the interest of the general health or welfare of its inhabitants, a State might establish a program of compulsory treatment for those addicted to narcotics.[7] Such a program of treatment might require periods of involuntary confinement. And penal sanctions might be imposed for failure to comply with established compulsory treatment procedures. Cf. *Jacobson* v. *Massachusetts,* 197 U. S. 11. Or a State might choose to attack the evils of narcotics traffic on broader fronts also—through public health education, for example, or by efforts to ameliorate the economic and social conditions under which those evils might be thought to flourish. In short, the range of valid choice which a State might make in this area is undoubtedly a wide one, and the wisdom of any particular choice within the allowable spectrum is not for us to decide. Upon that premise we turn to the California law in issue here.

It would be possible to construe the statute under which the appellant was convicted as one which is operative only upon proof of the actual use of narcotics within the State's jurisdiction. But the California courts have not so construed this law. Although there was evidence in the present case that the appellant had used narcotics in Los Angeles, the jury were instructed that they could convict him even if they disbelieved that evidence. The appellant could be convicted, they were told, if they found simply that the appellant's "status" or "chronic condition" was that of being "addicted to the use of narcotics." And it is impossible to know from the jury's verdict that the defendant was not convicted upon precisely such a finding.

---

[7] California appears to have established just such a program in §§ 5350–5361 of its Welfare and Institutions Code. The record contains no explanation of why the civil procedures authorized by this legislation were not utilized in the present case.

The instructions of the trial court, implicitly approved on appeal, amounted to "a ruling on a question of state law that is as binding on us as though the precise words had been written" into the statute. *Terminiello* v. *Chicago,* 337 U. S. 1, 4. "We can only take the statute as the state courts read it." *Id.,* at 6. Indeed, in their brief in this Court counsel for the State have emphasized that it is "the proof of addiction by circumstantial evidence . . . by the tell-tale track of needle marks and scabs over the veins of his arms, that remains the gist of the section."

This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the "status" of narcotic addiction a criminal offense, for which the offender may be prosecuted "at any time before he reforms." California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there.

It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. See *Francis* v. *Resweber,* 329 U. S. 459.

We cannot but consider the statute before us as of the same category. In this Court counsel for the State recognized that narcotic addiction is an illness.[8] Indeed, it is apparently an illness which may be contracted innocently or involuntarily.[9] We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the "crime" of having a common cold.

We are not unmindful that the vicious evils of the narcotics traffic have occasioned the grave concern of government. There are, as we have said, countless fronts on

[8] In its brief the appellee stated: "Of course it is generally conceded that a narcotic addict, particularly one addicted to the use of heroin, is in a state of mental and physical illness. So is an alcoholic." Thirty-seven years ago this Court recognized that persons addicted to narcotics "are diseased and proper subjects for [medical] treatment." *Linder* v. *United States,* 268 U. S. 5, 18.

[9] Not only may addiction innocently result from the use of medically prescribed narcotics, but a person may even be a narcotics addict from the moment of his birth. See Schneck, Narcotic Withdrawal Symptoms in the Newborn Infant Resulting from Maternal Addiction, 52 Journal of Pediatrics 584 (1958); Roman and Middelkamp, Narcotic Addiction in a Newborn Infant, 53 Journal of Pediatrics 231 (1958); Kunstadter, Klein, Lundeen, Witz, and Morrison, Narcotic Withdrawal Symptoms in Newborn Infants, 168 Journal of the American Medical Association 1008 (1958); Slobody and Cobrinik, Neonatal Narcotic Addiction, 14 Quarterly Review of Pediatrics 169 (1959); Vincow and Hackel, Neonatal Narcotic Addiction, 22 General Practitioner 90 (1960); Dikshit, Narcotic Withdrawal Syndrome in Newborns, 28 Indian Journal of Pediatrics 11 (1961).

668

which those evils may be legitimately attacked. We deal in this case only with an individual provision of a particularized local law as it has so far been interpreted by the California courts.

*Reversed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion, I wish to make more explicit the reasons why I think it is "cruel and unusual" punishment in the sense of the Eighth Amendment to treat as a criminal a person who is a drug addict.

In Sixteenth Century England one prescription for insanity was to beat the subject "until he had regained his reason." Deutsch, The Mentally Ill in America (1937), p. 13. In America "the violently insane went to the whipping post and into prison dungeons or, as sometimes happened, were burned at the stake or hanged"; and "the pauper insane often roamed the countryside as wild men and from time to time were pilloried, whipped, and jailed." Action for Mental Health (1961), p. 26.

As stated by Dr. Isaac Ray many years ago:

> "Nothing can more strongly illustrate the popular ignorance respecting insanity than the proposition, equally objectionable in its humanity and its logic, that the insane should be punished for criminal acts, in order to deter other insane persons from doing the same thing." Treatise on the Medical Jurisprudence of Insanity (5th ed. 1871), p. 56.

Today we have our differences over the legal definition of insanity. But however insanity is defined, it is in end effect treated as a disease. While afflicted people

may be confined either for treatment or for the protection of society, they are not branded as criminals.

Yet terror and punishment linger on as means of dealing with some diseases. As recently stated:

". . . the idea of basing treatment for disease on purgatorial acts and ordeals is an ancient one in medicine. It may trace back to the Old Testament belief that disease of any kind, whether mental or physical, represented punishment for sin; and thus relief could take the form of a final heroic act of atonement. This superstition appears to have given support to fallacious medical rationales for such procedures as purging, bleeding, induced vomiting, and blistering, as well as an entire chamber of horrors constituting the early treatment of mental illness. The latter included a wide assortment of shock techniques, such as the 'water cures' (dousing, ducking, and near-drowning), spinning in a chair, centrifugal swinging, and an early form of electric shock. All, it would appear, were planned as means of driving from the body some evil spirit or toxic vapor." Action for Mental Health (1961), pp. 27–28.

That approach continues as respects drug addicts. Drug addiction is more prevalent in this country than in any other nation of the western world.[1] S. Rep. No. 1440, 84th Cong., 2d Sess., p. 2. It is sometimes referred to as "a contagious disease." Id., at p. 3. But those living in a world of black and white put the addict in the cate-

---

[1] Drug Addiction: Crime or Disease? (1961), p. XIV. ". . . even if one accepts the lowest estimates of the number of addicts in this country there would still be more here than in all the countries of Europe combined. Chicago and New York City, with a combined population of about 11 million or one-fifth that of Britain, are ordinarily estimated to have about 30,000 addicts, which is from thirty to fifty times as many as there are said to be in Britain."

gory of those who could, if they would, forsake their evil ways.

The first step toward addiction may be as innocent as a boy's puff on a cigarette in an alleyway. It may come from medical prescriptions. Addiction may even be present at birth. Earl Ubell recently wrote:

"In Bellevue Hospital's nurseries, Dr. Saul Krugman, head of pediatrics, has been discovering babies minutes old who are heroin addicts.

"More than 100 such infants have turned up in the last two years, and they show all the signs of drug withdrawal: irritability, jitters, loss of appetite, vomiting, diarrhea, sometimes convulsions and death.

" 'Of course, they get the drug while in the womb from their mothers who are addicts,' Dr. Krugman said yesterday when the situation came to light. 'We control the symptoms with Thorazine, a tranquilizing drug.

" 'You should see some of these children. They have a high-pitched cry. They appear hungry but they won't eat when offered food. They move around so much in the crib that their noses and toes become red and excoriated.'

"Dr. Lewis Thomas, professor of medicine at New York University-Bellevue, brought up the problem of the babies Monday night at a symposium on narcotics addiction sponsored by the New York County Medical Society. He saw in the way the babies respond to treatment a clue to the low rate of cure of addiction.

" 'Unlike the adult addict who gets over his symptoms of withdrawal in a matter of days, in most cases,' Dr. Thomas explained later, 'the infant has to be treated for weeks and months. The baby continues to show physical signs of the action of the drugs.

" 'Perhaps in adults the drugs continue to have physical effects for a much longer time after withdrawal than we have been accustomed to recognize. That would mean that these people have a physical need for the drug for a long period, and this may be the clue to recidivism much more than the social or psychological pressures we've been talking about.' " N. Y. Herald Tribune, Apr. 25, 1962, p. 25, cols. 3–4.

The addict is under compulsions not capable of management without outside help. As stated by the Council on Mental Health:

"Physical dependence is defined as the development of an altered physiological state which is brought about by the repeated administration of the drug and which necessitates continued administration of the drug to prevent the appearance of the characteristic illness which is termed an abstinence syndrome. When an addict says that he has a habit, he means that he is physically dependent on a drug. When he says that one drug is habit-forming and another is not, he means that the first drug is one on which physical dependence can be developed and that the second is a drug on which physical dependence cannot be developed. Physical dependence is a real physiological disturbance. It is associated with the development of hyperexcitability in reflexes mediated through multineurone arcs. It can be induced in animals, it has been shown to occur in the paralyzed hind limbs of addicted chronic spinal dogs, and also has been produced in dogs whose cerebral cortex has been removed." Report on Narcotic Addiction, 165 A. M. A. J. 1707, 1713.

Some say the addict has a disease. See Hesse, Narcotics and Drug Addiction (1946), p. 40 *et seq.*

672

Others say addiction is not a disease but "a symptom of a mental or psychiatric disorder." H. R. Rep. No. 2388, 84th Cong., 2d Sess., p. 8. And see Present Status of Narcotic Addiction, 138 A. M. A. J. 1019, 1026; Narcotic Addiction, Report to Attorney General Brown by Citizens Advisory Committee to the Attorney General on Crime Prevention (1954), p. 12; Finestone, Narcotics and Criminality, 22 Law & Contemp. Prob. 69, 83–85 (1957).

The extreme symptoms of addiction have been described as follows:

"To be a confirmed drug addict is to be one of the walking dead .... The teeth have rotted out; the appetite is lost and the stomach and intestines don't function properly. The gall bladder becomes inflamed; eyes and skin turn a billious yellow. In some cases membranes of the nose turn a flaming red; the partition separating the nostrils is eaten away—breathing is difficult. Oxygen in the blood decreases; bronchitis and tuberculosis develop. Good traits of character disappear and bad ones emerge. Sex organs become affected. Veins collapse and livid purplish scars remain. Boils and abscesses plague the skin; gnawing pain racks the body. Nerves snap; vicious twitching develops. Imaginary and fantastic fears blight the mind and sometimes complete insanity results. Often times, too, death comes—much too early in life .... Such is the torment of being a drug addict; such is the plague of being one of the walking dead." N. Y. L. J., June 8, 1960, p. 4, col. 2.

Some States punish addiction, though most do not. See S. Doc. No. 120, 84th Cong., 2d Sess., pp. 41, 42. Nor does the Uniform Narcotic Drug Act, first approved in 1932 and now in effect in most of the States. Great Britain, beginning in 1920 placed "addiction and the

treatment of addicts squarely and exclusively into the hands of the medical profession." Lindesmith, The British System of Narcotics Control, 22 Law & Contemp. Prob. 138 (1957). In England the doctor "has almost complete professional autonomy in reaching decisions about the treatment of addicts." Schur, British Narcotics Policies, 51 J. Crim. L. & Criminology 619, 621 (1961). Under British law "addicts are patients, not criminals." *Ibid.* Addicts have not disappeared in England but they have decreased in number (*id.*, at 622) and there is now little "addict-crime" there. *Id.*, at 623.

The fact that England treats the addict as a sick person, while a few of our States, including California, treat him as a criminal, does not, of course, establish the unconstitutionality of California's penal law. But we do know that there is "a hard core" of "chronic and incurable drug addicts who, in reality, have lost their power of self-control." S. Rep. No. 2033, 84th Cong., 2d Sess., p. 8. There has been a controversy over the type of treatment—whether enforced hospitalization or ambulatory care is better. H. R. Rep. No. 2388, 84th Cong., 2d Sess., pp. 66–68. But there is little disagreement with the statement of Charles Winick: "The hold of drugs on persons addicted to them is so great that it would be almost appropriate to reverse the old adage and say that opium derivatives represent the religion of the people who use them." Narcotics Addiction and its Treatment, 22 Law & Contemp. Prob. 9 (1957). The abstinence symptoms and their treatment are well known. *Id.*, at 10–11. Cure is difficult because of the complex of forces that make for addiction. *Id.*, at 18–23. "After the withdrawal period, vocational activities, recreation, and some kind of psychotherapy have a major role in the treatment program, which ideally lasts from four to six months." *Id.*, at 23–24. Dr. Marie Nyswander tells us that normally a drug addict

674

must be hospitalized in order to be cured. The Drug Addict as a Patient (1956), p. 138.

The impact that an addict has on a community causes alarm and often leads to punitive measures. Those measures are justified when they relate to acts of transgression. But I do not see how under our system *being an addict* can be punished as a crime. If addicts can be punished for their addiction, then the insane can also be punished for their insanity. Each has a disease and each must be treated as a sick person.[2]  As Charles Winick has said:

> "There can be no single program for the elimination of an illness as complex as drug addiction, which

---

[2] "The sick addict must be quarantined until cured, and then carefully watched until fully rehabilitated to a life of normalcy." Narcotics, N. Y. Leg. Doc. No. 27 (1952), p. 116. And see the report of Judge Morris Ploscowe printed as Appendix A, Drug Addiction: Crime or Disease? (1961), pp. 18, 19–20, 21.

"These predilections for stringent law enforcement and severer penalties as answers to the problems of drug addiction reflect the philosophy and the teachings of the Bureau of Narcotics. For years the Bureau has supported the doctrine that if penalties for narcotic drug violations were severe enough and if they could be enforced strictly enough, drug addiction and the drug traffic would largely disappear from the American scene. This approach to problems of narcotics has resulted in spectacular modifications of our narcotic drug laws on both the state and federal level. . . .

    .      .      .      .

"Stringent law enforcement has its place in any system of controlling narcotic drugs. However, it is by no means the complete answer to American problems of drug addiction. In the first place it is doubtful whether drug addicts can be deterred from using drugs by threats of jail or prison sentences. The belief that fear of punishment is a vital factor in deterring an addict from using drugs rests upon a superficial view of the drug addiction process and the nature of drug addiction. . . .

". . . The very severity of law enforcement tends to increase the price of drugs on the illicit market and the profits to be made therefrom. The lure of profits and the risks of the traffic simply challenge the

carries so much emotional freight in the community. Cooperative interdisciplinary research and action, more local community participation, training the various healing professions in the techniques of dealing with addicts, regional treatment facilities, demonstration centers, and a thorough and vigorous post-treatment rehabilitation program would certainly appear to be among the minimum requirements for any attempt to come to terms with this problem. The addict should be viewed as a sick person, with a chronic disease which requires almost emergency action." 22 Law & Contemp. Prob. 9, 33 (1957).

The Council on Mental Health reports that criminal sentences for addicts interferes "with the possible treatment and rehabilitation of addicts and therefore should be abolished." 165 A. M. A. J. 1968, 1972.

The command of the Eighth Amendment, banning "cruel and unusual punishments," stems from the Bill of Rights of 1688. See *Francis* v. *Resweber,* 329 U. S. 459, 463. And it is applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. *Ibid.*

The historic punishments that were cruel and unusual included "burning at the stake, crucifixion, breaking on the wheel" (*In re Kemmler,* 136 U. S. 436, 446), quartering, the rack and thumbscrew (see *Chambers* v. *Florida,* 309 U. S. 227, 237), and in some circumstances even solitary confinement (see *Medley,* 134 U. S. 160, 167–168).

---

ingenuity of the underworld peddlers to find new channels of distribution and new customers, so that profits can be maintained despite the risks involved. So long as a non-addict peddler is willing to take the risk of serving as a wholesaler of drugs, he can always find addict pushers or peddlers to handle the retail aspects of the business in return for a supply of the drugs for themselves. Thus, it is the belief of the author of this report that no matter how severe law enforcement may be, the drug traffic cannot be eliminated under present prohibitory repressive statutes."

The question presented in the earlier cases concerned the degree of severity with which a particular offense was punished or the element of cruelty present.[3]   A punishment out of all proportion to the offense may bring it within the ban against "cruel and unusual punishments."   See *O'Neil* v. *Vermont,* 144 U. S. 323, 331.   So may the cruelty of the method of punishment, as, for example, disemboweling a person alive.   See *Wilkerson* v. *Utah,* 99 U. S. 130, 135.   But the principle that would deny power to exact capital punishment for a petty crime would also deny power to punish a person by fine or imprisonment for being sick.

The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the "cry of horror" against man's inhumanity to his fellow man.   See *O'Neil* v. *Vermont, supra,* at 340 (dissenting opinion); *Francis* v. *Resweber, supra,* at 473 (dissenting opinion).

By the time of Coke, enlightenment was coming as respects the insane.   Coke said that the execution of a madman "should be a miserable spectacle, both against law, and of extreame inhumanity and cruelty, and can be no example to others."   6 Coke's Third Inst. (4th ed. 1797), p. 6.   Blackstone endorsed this view of Coke. 4 Commentaries (Lewis ed. 1897), p. 25.

We should show the same discernment respecting drug addiction.   The addict is a sick person.   He may, of course, be confined for treatment or for the protection of society.[4]   Cruel and unusual punishment results not from confinement, but from convicting the addict of a crime. The purpose of § 11721 is not to cure, but to penalize.

---

[3] See 3 Catholic U. L. Rev. 117 (1953); 31 Marq. L. Rev. 108 (1947); 22 St. John's L. Rev. 270 (1948); 2 Stan. L. Rev. 174 (1949); 33 Va. L. Rev. 348 (1947); 21 Tul. L. Rev. 480 (1947); 1960 Wash. U. L. Q., p. 160.

[4] As to the insane, see *Lynch* v. *Overholser,* 369 U. S. 705; note, 1 L. R. A. (N. S.), p. 540 *et seq.*

Were the purpose to cure, there would be no need for a mandatory jail term of not less than 90 days. Contrary to my Brother CLARK, I think the means must stand constitutional scrutiny, as well as the end to be achieved. A prosecution for addiction, with its resulting stigma and irreparable damage to the good name of the accused, cannot be justified as a means of protecting society, where a civil commitment would do as well. Indeed, in § 5350 of the Welfare and Institutions Code, California has expressly provided for civil proceedings for the commitment of habitual addicts. Section 11721 is, in reality, a direct attempt to punish those the State cannot commit civilly.[5] This prosecution has no relationship to the curing

---

[5] The difference between § 5350 and § 11721 is that the former aims at treatment of the addiction, whereas § 11721 does not. The latter cannot be construed to provide treatment, unless jail sentences, without more, are suddenly to become medicinal. A comparison of the lengths of confinement under the two sections is irrelevant, for it is the purpose of the confinement that must be measured against the constitutional prohibition of cruel and unusual punishments.

Health and Safety Code § 11391, to be sure, indicates that perhaps some form of treatment may be given an addict convicted under § 11721. Section 11391, so far as here relevant, provides:

"No person shall treat an addict for addiction except in one of the following:

"(a) An institution approved by the Board of Medical Examiners, and where the patient is at all times kept under restraint and control.

"(b) A *city or county jail.*

"(c) A state prison.

"(d) A state narcotic hospital.

"(e) A state hospital.

"(f) A county hospital.

"This section does not apply during emergency treatment or where the patient's addiction is complicated by the presence of incurable disease, serious accident, or injury, or the infirmities of old age." (Emphasis supplied.)

Section 11391 does not state that any treatment is required for either part or the whole of the mandatory 90-day prison term imposed by § 11721. Should the necessity for treatment end before the 90-day

of an illness. Indeed, it cannot, for the prosecution is aimed at penalizing an illness, rather than at providing medical care for it. We would forget the teachings of the Eighth Amendment if we allowed sickness to be made a crime and permitted sick people to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action.

MR. JUSTICE HARLAN, concurring.

I am not prepared to hold that on the present state of medical knowledge it is completely irrational and hence unconstitutional for a State to conclude that narcotics addiction is something other than an illness nor that it amounts to cruel and unusual punishment for the State to subject narcotics addicts to its criminal law. Insofar as addiction may be identified with the use or possession of narcotics within the State (or, I would suppose, without the State), in violation of local statutes prohibiting such acts, it may surely be reached by the State's criminal law. But in this case the trial court's instructions permitted the jury to find the appellant guilty on no more proof than that he was present in California while he was addicted to narcotics.* Since addiction alone cannot

term is concluded, or should no treatment be given, the addict clearly would be undergoing punishment for an illness. Therefore, reference to § 11391 will not solve or alleviate the problem of cruel and unusual punishment presented by this case.

*The jury was instructed that "it is not incumbent upon the People to prove the unlawfulness of defendant's use of narcotics. All that the People must show is *either* that the defendant did use a narcotic in Los Angeles County, *or* that while in the City of Los Angeles he was addicted to the use of narcotics." (Emphasis added.) Although the jury was told that it should acquit if the appellant proved that his "being addicted to the use of narcotics was administered [*sic*] by or under the direction of a person licensed by the State of California to prescribe and administer narcotics," this part of the instruction did not cover other possible lawful uses which could have produced the appellant's addiction.

reasonably be thought to amount to more than a compelling propensity to use narcotics, the effect of this instruction was to authorize criminal punishment for a bare desire to commit a criminal act.

If the California statute reaches this type of conduct, and for present purposes we must accept the trial court's construction as binding, *Terminiello* v. *Chicago,* 337 U. S. 1, 4, it is an arbitrary imposition which exceeds the power that a State may exercise in enacting its criminal law. Accordingly, I agree that the application of the California statute was unconstitutional in this case and join the judgment of reversal.

MR. JUSTICE CLARK, dissenting.

The Court finds § 11721 of California's Health and Safety Code, making it an offense to "be addicted to the use of narcotics," violative of due process as "a cruel and unusual punishment." I cannot agree.

The statute must first be placed in perspective. California has a comprehensive and enlightened program for the control of narcotism based on the overriding policy of prevention and cure. It is the product of an extensive investigation made in the mid-Fifties by a committee of distinguished scientists, doctors, law enforcement officers and laymen appointed by the then Attorney General, now Governor, of California. The committee filed a detailed study entitled "Report on Narcotic Addiction" which was given considerable attention. No recommendation was made therein for the repeal of § 11721, and the State Legislature in its discretion continued the policy of that section.

Apart from prohibiting specific acts such as the purchase, possession and sale of narcotics, California has taken certain legislative steps in regard to the status of being a narcotic addict—a condition commonly recognized as a threat to the State and to the individual. The

Code deals with this problem in realistic stages. At its incipiency narcotic addiction is handled under § 11721 of the Health and Safety Code which is at issue here. It provides that a person found to be addicted to the use of narcotics shall serve a term in the county jail of not less than 90 days nor more than one year, with the minimum 90-day confinement applying in all cases without exception. Provision is made for parole with periodic tests to detect readdiction.

The trial court defined "addicted to narcotics" as used in § 11721 in the following charge to the jury:

"The word 'addicted' means, strongly disposed to some taste or practice or habituated, especially to drugs. In order to inquire as to whether a person is addicted to the use of narcotics is in effect an inquiry as to his habit in that regard. Does he use them habitually. To use them often or daily is, according to the ordinary acceptance of those words, to use them habitually."

There was no suggestion that the term "narcotic addict" as here used included a person who acted without volition or who had lost the power of self-control. Although the section is penal in appearance—perhaps a carry-over from a less sophisticated approach—its present provisions are quite similar to those for civil commitment and treatment of addicts who have lost the power of self-control, and its present purpose is reflected in a statement which closely follows § 11721: "The rehabilitation of narcotic addicts and the prevention of continued addiction to narcotics is a matter of statewide concern." California Health and Safety Code § 11728.

Where narcotic addiction has progressed beyond the incipient, volitional stage, California provides for commitment of three months to two years in a state hospital.

California Welfare and Institutions Code § 5355. For the purposes of this provision, a narcotic addict is defined as

"any person who habitually takes or otherwise uses *to the extent of having lost the power of self-control* any opium, morphine, cocaine, or other narcotic drug as defined in Article 1 of Chapter 1 of Division 10 of the Health and Safety Code." California Welfare and Institutions Code § 5350. (Emphasis supplied.)

This proceeding is clearly civil in nature with a purpose of rehabilitation and cure. Significantly, if it is found that a person committed under § 5355 will not receive substantial benefit from further hospital treatment and is not dangerous to society, he may be discharged—but only after a minimum confinement of three months. § 5355.1.

Thus, the "criminal" provision applies to the incipient narcotic addict who retains self-control, requiring confinement of three months to one year and parole with frequent tests to detect renewed use of drugs. Its overriding purpose is to cure the less seriously addicted person by preventing further use. On the other hand, the "civil" commitment provision deals with addicts who have lost the power of self-control, requiring hospitalization up to two years. Each deals with a different type of addict but with a common purpose. This is most apparent when the sections overlap: if after civil commitment of an addict it is found that hospital treatment will not be helpful, the addict is confined for a minimum period of three months in the same manner as is the volitional addict under the "criminal" provision.

In the instant case the proceedings against the petitioner were brought under the volitional-addict section. There was testimony that he had been using drugs only four months with three to four relatively mild doses a

682

week. At arrest and trial he appeared normal. His testimony was clear and concise, being simply that he had never used drugs. The scabs and pocks on his arms and body were caused, he said, by "overseas shots" administered during army service preparatory to foreign assignment. He was very articulate in his testimony but the jury did not believe him, apparently because he had told the clinical expert while being examined after arrest that he had been using drugs, as I have stated above. The officer who arrested him also testified to like statements and to scabs—some 10 or 15 days old—showing narcotic injections. There was no evidence in the record of withdrawal symptoms. Obviously he could not have been committed under § 5355 as one who had completely "lost the power of self-control." The jury was instructed that narcotic "addiction" as used in § 11721 meant strongly disposed to a taste or practice or habit of its use, indicated by the use of narcotics often or daily. A general verdict was returned against petitioner, and he was ordered confined for 90 days to be followed by a two-year parole during which he was required to take periodic Nalline tests.

The majority strikes down the conviction primarily on the grounds that petitioner was denied due process by the imposition of criminal penalties for nothing more than being in a status. This viewpoint is premised upon the theme that § 11721 is a "criminal" provision authorizing a punishment, for the majority admits that "a State might establish a program of compulsory treatment for those addicted to narcotics" which "might require periods of involuntary confinement." I submit that California has done exactly that. The majority's error is in instructing the California Legislature that hospitalization is the *only treatment* for narcotics addiction—that anything less is a punishment denying due process. California has found otherwise after a study which I suggest was more extensive than that conducted by the Court.

Even in California's program for hospital commitment of nonvolitional narcotic addicts—which the majority approves—it is recognized that some addicts will not respond to or do not need hospital treatment.   As to these persons its provisions are identical to those of § 11721— confinement for a period of not less than 90 days.   Section 11721 provides this confinement as treatment for the volitional addicts to whom its provisions apply, in addition to parole with frequent tests to detect and prevent further use of drugs.   The fact that § 11721 might be labeled "criminal" seems irrelevant,* not only to the majority's own "treatment" test but to the "concept of ordered liberty" to which the States must attain under the Fourteenth Amendment.   The test is the overall purpose and effect of a State's act, and I submit that California's program relative to narcotic addicts—including both the "criminal" and "civil" provisions—is inherently one of treatment and lies well within the power of a State.

However, the case in support of the judgment below need not rest solely on this reading of California law. For even if the overall statutory scheme is ignored and a purpose and effect of punishment is attached to § 11721, that provision still does not violate the Fourteenth Amendment.   The majority acknowledges, as it must, that a State can punish persons who purchase, possess or use narcotics.   Although none of these acts are harmful to society *in themselves,* the State constitutionally may attempt to deter and prevent them through punishment because of the grave threat of future harmful conduct which they pose.   Narcotics addiction—including the incipient, volitional addiction to which this provision speaks—is no different.   California courts have taken judicial notice that "the inordinate use of a narcotic drug tends

---

*Any reliance upon the "stigma" of a misdemeanor conviction in this context is misplaced, as it would hardly be different from the stigma of a civil commitment for narcotics addiction.

to create an irresistible craving and forms a habit for its continued use until one becomes an addict, and he respects no convention or obligation and will lie, steal, or use any other base means to gratify his passion for the drug, being lost to all considerations of duty or social position." *People* v. *Jaurequi*, 142 Cal. App. 2d 555, 561, 298 P. 2d 896, 900 (1956). Can this Court deny the legislative and judicial judgment of California that incipient, volitional narcotic addiction poses a threat of serious crime similar to the threat inherent in the purchase or possession of narcotics? And if such a threat is inherent in addiction, can this Court say that California is powerless to deter it by punishment?

It is no answer to suggest that we are dealing with an involuntary status and thus penal sanctions will be ineffective and unfair. The section at issue applies only to persons who use narcotics often or even daily but not to the point of losing self-control. When dealing with involuntary addicts California moves only through § 5355 of its Welfare Institutions Code which clearly is not penal. Even if it could be argued that § 11721 may not be limited to volitional addicts, the petitioner in the instant case undeniably retained the power of self-control and thus to him the statute would be constitutional. Moreover, "status" offenses have long been known and recognized in the criminal law. 4 Blackstone, Commentaries (Jones ed. 1916), 170. A ready example is drunkenness, which plainly is as involuntary after addiction to alcohol as is the taking of drugs.

Nor is the conjecture relevant that petitioner may have acquired his habit under lawful circumstances. There was no suggestion by him to this effect at trial, and surely the State need not rebut all possible lawful sources of addiction as part of its prima facie case.

The argument that the statute constitutes a cruel and unusual punishment is governed by the discussion above.

Properly construed, the statute provides a treatment rather than a punishment. But even if interpreted as penal, the sanction of incarceration for 3 to 12 months is not unreasonable when applied to a person who has voluntarily placed himself in a condition posing a serious threat to the State. Under either theory, its provisions for 3 to 12 months' confinement can hardly be deemed unreasonable when compared to the provisions for 3 to 24 months' confinement under § 5355 which the majority approves.

I would affirm the judgment.

Mr. Justice White, dissenting.

If appellant's conviction rested upon sheer status, condition or illness or if he was convicted for being an addict who had lost his power of self-control, I would have other thoughts about this case. But this record presents neither situation. And I believe the Court has departed from its wise rule of not deciding constitutional questions except where necessary and from its equally sound practice of construing state statutes, where possible, in a manner saving their constitutionality.[1]

---

[1] It has repeatedly been held in this Court that its practice will not be "to decide any constitutional question in advance of the necessity for its decision . . . or . . . except with reference to the particular facts to which it is to be applied," *Alabama State Federation* v. *McAdory*, 325 U. S. 450, 461, and that state statutes will always be construed, if possible, to save their constitutionality despite the plausibility of different but unconstitutional interpretation of the language. Thus, the Court recently reaffirmed the principle in *Oil Workers Unions* v. *Missouri*, 361 U. S. 363, 370: "When that claim is litigated it will be subject to review, but it is not for us now to anticipate its outcome. ' "Constitutional questions are not to be dealt with abstractly". . . . They will not be anticipated but will be dealt with only as they are appropriately raised upon a record before us. . . . Nor will we assume in advance that a State will so

686

I am not at all ready to place the use of narcotics beyond the reach of the States' criminal laws. I do not consider appellant's conviction to be a punishment for having an illness or for simply being in some status or condition, but rather a conviction for the regular, repeated or habitual use of narcotics immediately prior to his arrest and in violation of the California law. As defined by the trial court,[2] addiction *is* the regular use of narcotics and can be proved only by evidence of such use. To find addiction in this case the jury had to believe that appellant had frequently used narcotics in the recent past.[3] California is entitled to have its statute and the record so read, particularly where the State's only purpose in allowing prosecutions for addiction was to supersede its own venue requirements applicable to prosecutions for the use of narcotics and in effect to allow convictions for use

construe its law as to bring it into conflict with the federal Constitution or an act of Congress.' *Allen-Bradley Local* v. *Wisconsin Board*, 315 U. S. 740, at 746."

[2] The court instructed the jury that, "The word 'addicted' means, strongly disposed to some taste or practice or habituated, especially to drugs. In order to inquire as to whether a person is addicted to the use of narcotics is in effect an inquiry as to his habit in that regard. . . . To use them often or daily is, according to the ordinary acceptance of those words, to use them habitually."

[3] This is not a case where a defendant is convicted "even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there." The evidence was that appellant lived and worked in Los Angeles. He admitted before trial that he had used narcotics for three or four months, three or four times a week, usually at his place with his friends. He stated to the police that he had last used narcotics at 54th and Central in the City of Los Angeles on January 27, 8 days before his arrest. According to the State's expert, no needle mark or scab found on appellant's arms was newer than 3 days old and the most recent mark might have been as old as 10 days, which was consistent with appellant's own pretrial admissions. The State's evidence was that appellant had used narcotics at least 7 times in the 15 days immediately preceding his arrest.

where there is no precise evidence of the county where the use took place.[4]

Nor do I find any indications in this record that California would apply § 11721 to the case of the helpless addict. I agree with my Brother CLARK that there was no evidence at all that appellant had lost the power to control his acts. There was no evidence of any use within 3 days prior to appellant's arrest. The most recent marks might have been 3 days old or they might have been 10

---

[4] The typical case under the narcotics statute, as the State made clear in its brief and argument, is the one where the defendant makes no admissions, as he did in this case, and the only evidence of use or addiction is presented by an expert who, on the basis of needle marks and scabs or other physical evidence revealed by the body of the defendant, testifies that the defendant has regularly taken narcotics in the recent past. See, *e. g.*, *People* v. *Williams*, 164 Cal. App. 2d 858, 331 P. 2d 251; *People* v. *Garcia*, 122 Cal. App. 2d 962, 266 P. 2d 233; *People* v. *Ackles*, 147 Cal. App. 2d 40, 304 P. 2d 1032. Under the local venue requirements, a conviction for simple use of narcotics may be had only in the county where the use took place, *People* v. *Garcia, supra*, and in the usual case evidence of the precise location of the use is lacking. Where the charge is addiction, venue under § 11721 of the Health and Safety Code may be laid in any county where the defendant is found. *People* v. *Ackles, supra*, 147 Cal. App. 2d, at 42–43, 304 P. 2d, at 1033, distinguishing *People* v. *Thompson*, 144 Cal. App. 2d 854, 301 P. 2d 313. Under California law a defendant has no constitutional right to be tried in any particular county, but under statutory law, with certain exceptions, "an accused person is answerable only in the jurisdiction where the crime, or some part or effect thereof, was committed or occurred." *People* v. *Megladdery*, 40 Cal. App. 2d 748, 762, 106 P. 2d 84, 92. A charge of narcotics addiction is one of the exceptions and there are others. See, *e. g.*, §§ 781, 784, 785, 786, 788, Cal. Penal Code. Venue is to be determined from the evidence and is for the jury, but it need not be proved beyond a reasonable doubt. *People* v. *Megladdery, supra*, 40 Cal. App. 2d, at 764, 106 P. 2d, at 93. See *People* v. *Bastio*, 55 Cal. App. 2d 615, 131 P. 2d 614; *People* v. *Garcia, supra*. In reviewing convictions in narcotics cases, appellate courts view the evidence of venue "in the light most favorable to the judgment." *People* v. *Garcia, supra*.

days old. The appellant admitted before trial that he had last used narcotics 8 days before his arrest. At the trial he denied having taken narcotics at all. The uncontroverted evidence was that appellant was not under the influence of narcotics at the time of his arrest nor did he have withdrawal symptoms. He was an incipient addict, a redeemable user, and the State chose to send him to jail for 90 days rather than to attempt to confine him by civil proceedings under another statute which requires a finding that the addict has lost the power of self-control. In my opinion, on this record, it was within the power of the State of California to confine him by criminal proceedings for the use of narcotics or for regular use amounting to habitual use.[5]

The Court clearly does not rest its decision upon the narrow ground that the jury was not expressly instructed not to convict if it believed appellant's use of narcotics was beyond his control. The Court recognizes no degrees of addiction. The Fourteenth Amendment is today held to bar any prosecution for addiction regardless of the degree or frequency of use, and the Court's opinion bristles with indications of further consequences. If it is "cruel and unusual punishment" to convict appellant for addiction, it is difficult to understand why it would be any less offensive to the Fourteenth Amendment to convict him for use on the same evidence of use which proved he was an addict. It is significant that in purporting to reaffirm the power of the States to deal with the narcotics traffic, the Court does not include among the obvious powers of the State the power to punish for the use of narcotics. I cannot think that the omission was inadvertent.

---

[5] Health and Safety Code § 11391 expressly permits and contemplates the medical treatment of narcotics addicts confined to jail.

The Court has not merely tidied up California's law by removing some irritating vestige of an outmoded approach to the control of narcotics. At the very least, it has effectively removed California's power to deal effectively with the recurring case under the statute where there is ample evidence of use but no evidence of the precise location of use. Beyond this it has cast serious doubt upon the power of any State to forbid the use of narcotics under threat of criminal punishment. I cannot believe that the Court would forbid the application of the criminal laws to the use of narcotics under any circumstances. But the States, as well as the Federal Government, are now on notice. They will have to await a final answer in another case.

Finally, I deem this application of "cruel and unusual punishment" so novel that I suspect the Court was hard put to find a way to ascribe to the Framers of the Constitution the result reached today rather than to its own notions of ordered liberty. If this case involved economic regulation, the present Court's allergy to substantive due process would surely save the statute and prevent the Court from imposing its own philosophical predilections upon state legislatures or Congress. I fail to see why the Court deems it more appropriate to write into the Constitution its own abstract notions of how best to handle the narcotics problem, for it obviously cannot match either the States or Congress in expert understanding.

I respectfully dissent.