369 So.2d 1308 (1979)
STATE of Louisiana
v.
Virgil PUGH.
No. 63208.
Supreme Court of Louisiana.
April 9, 1979.
Joseph T. Dalrymple, Antoon, Dalrymple & Beck, Alexandria, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., Donald T. Johnson, Asst. Dist. Atty., for plaintiff-respondent.
BLANCHE, Justice.
We granted defendant's writ application wherein he seeks relief from denial of a motion to quash six bills of information. We have before us the question of whether the charge of vagrancy by being an habitual drunkard is one which is constitutionally sound.
Defendant was arrested a number of times during the summer of 1978 upon complaints made to police about his conduct. The complaints were made by his neighbors and by his mother and brother. He was charged in six bills of information, each charging him with a violation of LSA-R.S. 14:107(1), vagrancy by being an habitual drunkard. Defendant filed a motion to quash the bills of information, but it was denied by the trial judge. Defendant then applied to this Court.
Defendant argues that the statute under which he was charged is, on its face, overbroad and vague, that it violates his right to privacy, and that punishment under it would constitute cruel and unusual punishment. He claims that the statute is unconstitutional under the constitutions of both the United States [1] and Louisiana.[2]
R.S. 14:107 states, in relevant part:
"The following persons are and shall be guilty of vagrancy:
"(1) Habitual drunkards . . . ."
Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), applies the test of vagueness which had been articulated in the earlier case of Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). In Lanzetta the Court, quoting Connally, found that the language of a statute
". . . must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties[.] [This] is a wellrecognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law[.] [A]nd a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (306 U.S. at 453, 59 S.Ct. at 619, 83 L.Ed. at 890) *1309 Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), deals with a conviction on the basis of a status or chronic condition. In ruling on the statute in that case the court said:
"This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the `status' of narcotic addiction a criminal offense, for which the offender may be prosecuted `at any time before he reforms.' . . .
"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." (370 U.S. at 666, 82 S.Ct. at 1420, 8 L.Ed.2d at 762, 763)
The court went went on to find that the punishment under the statute constituted cruel and unusual punishment as prohibited by the Eighth Amendment.
In Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the court distinguished Robinson from the situation it found in Texas, where the punishment was for conduct, not status. In Powell the court said:
"On its face the present case does not fall within that holding, since appellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion. The State of Texas thus has not sought to punish a mere status, as California did in Robinson; nor has it attempted to regulate appellant's behavior in the privacy of his own home. Rather, it has imposed upon appellant a criminal sanction for public behavior which may create substantial health and safety hazards, both for appellant and for members of the general public, and which offends the moral and esthetic sensibilities of a large segment of the community. This seems a far cry from convicting one for being an addict, being a chronic alcoholic, being `mentally ill, or a leper . . ..'" (392 U.S. at 532, 88 S.Ct. at 2154, 20 L.Ed.2d at 1267Emphasis added)
This Court has given similar treatment to the question of vagueness of a statute so as to render it constitutionally infirm in Connick v. Lucky Pierre's, 331 So.2d 431 (La. 1976). See also State v. Gisclair, 363 So.2d 696 (La.1978).
We find that the statute in question here, R.S. 14:107(1), is one which is vague (by reason of being overbroad) and one which seeks to punish status, rather than actions, so as to render any punishment thereunder cruel and unusual.
R.S. 14:107(1) does not set out any guidelines or definitions as to what constitutes habitual drunkenness and who may be classified as an habitual drunkard.
As to people, does it apply to the skid row bums, the after-work beer drinkers, the three-martini luncheon executives, the "TGIFers" at or about five o'clock on Friday afternoon in some local bar, or does it just apply to the Virgil Pughs of the world who may be either a "gamma" or "delta alcoholic"[3] and who was accused not too *1310 long ago of thrashing his mother's flowers with a golf club. As to frequency, does the statute proscribe against those who are "crocked" all the time or possibly those who down a couple of six packs watching weekend football on television from their favorite armchair? Furthermore, the above examples do not distinguish between public and private behavior and neither does the statute.
Accordingly, it may be seen that much imagination is involved as to how one would avoid the offense as well as to how or whom prosecutors should charge for violating the same.
Because of the nature of its vagueness and overbreadth, the statute imposes punishment even if every act with which the accused is charged is unproven. This is so because what the statute seeks to punish is not action but rather a status. No one would doubt the cruelty of punishing lepers, and the same is true of alcoholics, which we imagine the statute must have had in mind when it declared a vagrant to be an habitual drunkard. Thus, we hold that the statute violates the constitutional ban against cruel and unusual punishment as set forth in Robinson, supra.

DECREE
For these reasons, judgment is rendered declaring LSA-R.S. 14:107(1) to be constitutionally defective. It is further ordered adjudged and decreed that the ruling of the district court denying defendant's motion to quash the six bills of information charging him with a violation of LSA-R.S. 14-107(1) is hereby reversed and the matter is hereby remanded to the district court with orders to discharge the defendant.
REVERSED AND REMANDED.
NOTES
[1] U.S.Const. Amends. 5, 8 and 14.
[2] LSA-Const. Art. 1, §§ 2 and 20.
[3] In Powell v. Texas, supra, the Supreme Court observed:

". . . [T]here is widespread agreement today that `alcoholism' is a `disease,' for the simple reason that the medical profession has concluded that it should attempt to treat those who have drinking problems. There the agreement stops. Debate rages within the medical profession as to whether `alcoholism' is a separate `disease' in any meaningful biochemical, physiological or psychological sense, or whether it represents one peculiar manifestation in some individuals or underlying psychiatric disorders.
"Nor is there any substantial consensus as to the `manifestations of alcoholism.' E. M. Jellinek, one of the outstanding authorities on the subject, identifies five different types of alcoholics which predominate in the United States, and these types display a broad range of different and occasionally inconsistent symptoms. Moreover, wholly distinct types, relatively rare in this country, predominate in nations with different cultural attitudes regarding the consumption of alcohol. Even if we limit our consideration to the range of alcoholic symptoms more typically found in this country, there is substantial disagreement as to the manifestations of the `disease' called `alcoholism.' Jellinek, for example, considers that only two of his five alcoholic types can truly be said to be suffering from `alcoholism' as a `disease,' because only these two types attain what he believes to be the requisite degree of physiological dependence on alcohol. He applies the label `gamma alcoholism' to `that species of alcoholism in which (1) acquired increased tissue tolerance to alcohol, (2) adaptive cell metabolism * *, (3) withdrawal symptoms and "craving," i. e., physical dependence, and (4) loss of control are involved.' A `delta' alcoholic, on the other hand, `shows the first three characteristics of gamma alcoholism as well as a less marked form of the fourth characteristicthat is, instead of loss of control there is inability to abstain.' Other authorities approach the problems of classification in an entirely different manner and, taking account of the large role which psychosocial factors seem to play in `problem drinking,' define the `disease' in terms of the earliest identifiable manifestations of any sort of abnormality in drinking patterns." (88 S.Ct. at 2149)