OPINION OF THE COURT
John Manning Regan, J.
On March 11, 1982 the defendant pleaded guilty to a violation of subdivision 3 of section 1192 of the Vehicle and Traffic Law — operating a motor vehicle while under the influence of alcohol (DWI). This court must now impose sentence under subdivision 5 of section 1192 as amended by chapter 910 of the Laws of 1981.
The facts of the case are: That on February 4, 1982 on Upper Falls Boulevard, Rochester, New York, Ms. Ingham, a 28-year-old housewife, operated a vehicle while under the influence of alcohol. Her breathalyzer test was .24 of 1% of blood alcohol. On the previous day, she had received final divorce papers from her husband of the past 11 years. Despondent, she had been drinking heavily throughout the nighttime. About 6 o’clock in the morning, a minor accident, causing no discernible property damage or personal injury, precipitated her arrest. No prior alcohol history exists, and it is her first such charge.
*65 These attendant circumstances operate only in mitigation of sentence and punishment rather than as a defense to the charge, or in exoneration of guilt. Therefore, these circumstances would, ordinarily, influence me at this time in the manner in which I might impose sentence, including any fine.
Misdemeanors of this type — on first offense — generally indicate to this court that a probationary period is desirable, either supervised directly by the county Probation Department, or supervised indirectly by the police through a conditional discharge of one year. However, if there were any personal injury or property damage, restitution would be ordered. And, if the personal injury were serious or fatal a jail sentence would be imposed. A fine also is customary, depending on the circumstances.
However, since enactment of chapter 910 of the Laws of 1981, other factors have entered the sentencing process in respect to DWI offenses. The Legislature has removed all judicial discretion as to a part of the sentence. The new laws state: “5. A violation of subdivisions two, three, or four of this section * * * shall be punishable by imprisonment in a * * * county jail for not more than one year, or by a fine of not less than three hundred fifty dollars nor more than five hundred dollars, or by both such fine and imprisonment.” (Vehicle and Traffic Law, § 1192, subd 5.) And subdivision 6 states: “6. Notwithstanding any provision of the penal law, no judge or magistrate shall impose a sentence of unconditional discharge for a violation of any subdivision of this section nor shall he impose a sentence of conditional discharge unless such conditional discharge is accompanied by a sentence of a fine as provided in this section.” (Vehicle and Traffic Law, § 1192, subd 6.)
In approving this bill on July 31,1981, Governor Carey’s explanatory memorandum remarked:
“[These Laws] impose mandatory fines for alcohol-related driving offenses. The amounts of the fines are also substantially increased and are to be in addition to any sentence of imprisonment which a court is currently authorized to impose.
“The bills also allow localities to establish programs for the purpose of coordinating countywide efforts to reduce *66 alcohol-related traffic injuries. The programs, which will be funded by the fines imposed on persons convicted of alcohol-related offenses,[1] will include rehabilitative treatment [etc.]” (2 McKinney’s 1981 Session Laws of NY, p 2636; emphasis added).
In sum, these laws require the court either to send the defendant to jail or to fine her a minimum of $350.
Because the facts in this case do not justify, in my opinion, a term of imprisonment, I must, by law, fine the defendant at least $350.
The Monroe County Public Defender’s offiqe represented the indigent defendant in this case, and, at the time of taking her plea, asked the court to conduct an ability-to-pay hearing in accordance with CPL 420.10 (subd 4). The object of the hearing was the taking of proof on the economic resources of the defendant, to ascertain her ability to pay a fine of $350 and, to decide whether, in light of her admitted ■ indigency, the fine was excessive. After some legal argument, the court deferred sentencing and conducted the hearing on April 21, 1982.
The legal arguments are significant. CPL 420.10 (subd 4) allows only an “Application for resentence” based on a defendant’s inability to pay a fine. It is effective only after the court has already imposed the sentence of a fine or restitution, etc., not before. If after the fine is imposed a defendant meets the burden of proving his inability to pay in an evidentiary hearing, then the sentencing court may resentence the defendant under the statute.
In this respect, however, the statutory scheme of CPL 420.10 runs contrary to the express provisions of two fundamental organic laws. Both section 5 of article I of the New York State Constitution, and the Eighth Amendment of the United States Constitution, provide, in explicit and simple language: “Excessive bail shall not be required, nor excessive fines imposed” (emphasis added).
These constitutional provisions require that the question of excessiveness be answered before, or during, imposition *67 of sentence, not afterward. The constitutional injunction against excessiveness operates at or before the time of imposition of sentence. It is a prior or contemporaneous restraint on judicial discretion in sentencing. A court must, under these constitutional clauses, answer the issue of excessiveness, therefore, in the first instance, and cannot, as CPL 420.10 suggests, impose an excessive fine ab initio and correct it later on. The court must decide whether the fine is excessive now, not later.
The question thus becomes what, then, is an excessive fine under the Constitution?
In Tate v Short (401 US 395), the United States Supreme Court held that a fine of $425 was excessive if imposed on an indigent defendant who could not pay it and who faced jail as the only alternative to payment of the fine. (Cf., also, Williams v Illinois, 399 US 235.)
More significantly, our Court of Appeals in People v Saffore (18 NY2d 101, 104 [opn by Desmond, C. J.]) has held that: “A fine of $500 for a common misdemeanor, levied on a man who has no money at all, is necessarily excessive”.
The origins and history behind the adoption of these constitutional clauses provides some insight into the meaning of excessiveness.
These clauses first appeared in English constitutional history in the Petition of Right to King Charles I in 1628 and in the Declaration of Rights issued in 1689 by Parliament in the Act of Settlement. They were the creatures of the bloody “Glorious Revolution” of Seventeenth Century England. They derived from specific and notorious cases in which the Stuart Kings had trampled upon the Magna Carta rights of the English nobility.
A King’s bench judgment in 1680 against the Earl of Devonshire had levied a fine of £ 30,000 for a simple misdemeanor. And Sir John Hampden’s fine of £ 40,000, in 1683, had caused the forfeiture of all his estates. In the Seventeenth Century, the wealthiest Lords of England enjoyed annual incomes of less than £ 3,000. And lawyers *68 of that day lived well on £ 400 a year.[2] Accordingly, the fine of £ 30,000 confiscated more than 10 years of anticipated average income from the Earl; and Hampden’s £40,000 fine, almost 14 years. Were similar fines to be imposed on lawyers, or average citizens, they would have exceeded their lifetime income expectations.
Less than a century after the English Parliament had granted constitutional immunity from excessive fines to all Englishmen, George Clinton, president of the New York delegation to the Federal Constitutional Convention, proposed the ratification of the Constitution of the United States to the people of the State of New York, assembled in representative convention at Poughkeepsie in 1788. The Poughkeepsie convention ratified the Federal Constitution, but added a list of rights (which later became the bill of rights), to the ratification document. So did Virginia, North Carolina and Rhode Island. In each of these lists the guarantee against imposition of excessive fines, using the same language as the Declaration of Rights, is included.[3] By means of these ratification amendments, the Federal Bill of Rights, which contains the Eighth Amendment, emerged in the Constitution finally adopted in 1789 by the United States of America.
New York’s Constitution, in 1846, adopted a Bill of Rights which also contains the same language as the Eighth Amendment prohibiting excessive fines.
Both clauses are in force in New York. (See Robinson v California, 370 US 660.)
The court therefore concludes that one of the meanings of excessiveness intended by this language is a relative comparison between the amount of the fine and the wealth of the defendant.
For, what is similar between the cases in Seventeenth Century England and in Twentieth Century America, is a transcendent constancy in one of the meanings of excessiveness. In England in the 1680’s the fines were excessive (even on wealthy defendants) because they seized a dispro *69 portionate amount of a defendant’s annual income. In America, in 1966, in People v Saffore (18 NY2d 101, 104, supra), the fine of $500 is excessive because the defendant “has no money at all”. In both instances, the test applied is subjective. Excessiveness may be gauged in proportion to its impact on the subject who is fined.
History also demonstrates that fines, a punishment traditionally reserved for noncapital and pettier offenses, vary in amount with the nature of the offense. But these variations as yet have not entered the case law on the question of excessiveness. Thus far, neither a large, nor a small, fine is intrinsically excessive. The dollar, or pecuniary, amount of the fine has not been a decisive factor. Obviously, there is some quantum limitation, but that issue has remained dormant. The history and reported cases say that excessiveness is a question which does emerge from the extrinsic, disproportionate, relationship between the amount of the fine and the economic resources of the defendant.
With these principles in mind the court examined the economic resources of this defendant at the hearing on April 21, 1982.
In 1971, Ms. Ingham left school in the tenth grade and got married. She worked menial jobs in nursing homes and factories until she had a child in 1973. Her husband left her shortly afterwards. She continued to work and support herself and the child until 1980 when she moved into a house with another man and stopped working. Since then she has had two children by him, one 15 months, the other 3 months, at the time of the hearing. Although her ex-husband is supposed to pay child support, he is out of work, and neglects to pay. The man she lives with contributes to her maintenance and support and to that of their children. His contribution to the groceries for all the family is $60 per week. Ms. Ingham is not yet on welfare, but it is obvious she has no discretionary income and actually lives at subpoverty levels.
To these facts, the court must apply the principles of subjective disproportionate impact as outlined above; and apply them at the time of sentencing, not afterwards.
*70 The court finds that Ms. Ingham has no economic resources presently available, or in reasonably near expectancy, with which to pay the fine of $350 mandated by law. Accordingly, the court finds that, as to her, the mandated fine is excessive and constitutionally prohibited.
Buttressing this finding of excessiveness in this particular case, is the empirical data that this is the first such finding in more than 74 DWI cases to come before this court since chapter 910 of the Laws of 1981 took effect. In the other 73 cases, all the defendants were wealthy enough to pay the fine — most of them on the day of sentencing. Thus there is no constitutional infirmity in the law itself. The infirmity arises only upon its application. For the most part, defendants will be required to pay because no question of excessiveness — as to them — can be raised. But as to this defendant, on this day, in her economic circumstances, the constitutional injunction against excessive fines shall stand supreme.
The court sentences the defendant to a conditional discharge of one year.

. The substantial increases in the amount of the mandatory fines are neither retributive nor corrective in design. The Legislature has increased them to help finance alcohol-related county education programs.

. See 3 Browning, English Historical Documents (London Univ Press, 1953), pp 515-517.

. See Wait, Journal of the Federal Convention of 1787 (Boston, 1819), pp 426-428.