**Traci JACKSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. A14–91–00634–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

May 21, 1992.

Rehearing Denied June 11, 1992.

Discretionary Review Refused
Sept. 30, 1992.

---

4. *Marino v. State Farm Fire & Casualty Ins. Co.,*   787 S.W.2d 948, 950 (Tex.1990).

Alexander Bunin, Houston, for appellant.

Alan Curry, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

ELLIS, Justice.

Appellant, Traci Jackson, appeals her judgment of conviction for possession of a controlled substance weighing less than 28 grams by aggregate weight, including any adulterants and dilutants. TEX.HEALTH & SAFETY CODE ANN. § 481.112(a), (b) (Vernon Supp.1992). Appellant was charged with possession of cocaine and for committing the offense using a deadly weapon namely, cocaine. TEX.PENAL CODE ANN. § 1.07(a)(11)(B) (Vernon 1974). During trial, the State dropped the paragraph concerning committing the offense using a deadly weapon. The jury rejected appellant's not guilty plea and found appellant guilty of the offense of possession of cocaine. The trial court then assessed punishment at 12 years in the Institutional Division of the Texas Department of Criminal Justice. We reverse.

On July 9, 1989, at 8:00 a.m., Willie Castillo went to the apartment of Willie (no last name designated) after working with Willie on a paper route. Castillo stayed at the apartment all day. During the day Castillo saw a lot of people going in and out of the apartment. Castillo testified that though he had never used cocaine and the only time in his life he had ever seen cocaine was on this date, he knew exactly what it looked like and he knew that the people in the apartment were using it. He testified that a plate was being passed around and that appellant had the plate in her hand and was cutting cocaine with a razor blade into large chunks.

Castillo testified that appellant was going in and out of the apartment all day and that two men were with her. At one point during the day, Castillo noticed that appellant held her stomach and left the room to go into the bathroom. She carried a pipe with her. Once appellant left the room Castillo said he heard water running, a scream, and then a loud noise. Appellant returned to the room with a towel wrapped around her waist and began smoking cocaine. Castillo also testified that appellant would not allow anyone else to go into the bathroom.

Later that day, Jeanine Cooper arrived at the apartment to purchase cocaine. Cooper testified that she was a cocaine user at the time of the offense and had been for six years. She stated that she was strung out at the time. She noticed that appellant had a straight shooter glass piece of a pipe in her hand. She did not see appellant smoke cocaine. Cooper and appellant began to

quarrel. Appellant accused Cooper of having dirty lingerie in the apartment. Cooper went to the closet and found a plastic bag which appeared to have a baby doll inside. When Cooper opened the bag she discovered that a dead infant was inside the bag. Cooper immediately screamed and everyone in the apartment ran over to see what happened. Because of drug paraphernalia inside the apartment, it was decided that the police would not be called but an emergency medical unit was called. Emergency medical unit personnel attempted to resuscitate the baby unsuccessfully. It was later discovered that the child was stillborn.

Appellant had left the apartment, but efforts were made to try to find her. Appellant's shoes had been left in the bathroom. The shoes were later identified as containing blood that could have come from appellant. It was also determined that blood found on the shorts which the baby was wrapped in could have come from appellant. An analysis by the doctor performing the autopsy revealed that the infant was stillborn and that the cause of death probably was from ingestion of cocaine. The liver of the baby was found to contain .04 milligrams per deciliter of cocaine. A later DNA analysis confirmed that there was a 99.06% chance that the infant was born from appellant.

In appellant's first point of error, she contends the trial court erred in denying her motion for instructed verdict, because the evidence was insufficient to convict her of the crime. When ruling on a motion for instructed verdict, the appellate court uses the same standard it uses to review sufficiency of the evidence points. *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990), cert. denied, —— U.S. ——, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991). The appellate court views the evidence of both the State and the defense in the light most favorable to the verdict. *Id; Dickey v. State*, 693 S.W.2d 386, 387 (Tex.Crim. App.1984). The evidence will support a guilty verdict, if a rational trier of fact could find all the essential elements of the offense beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 843 (Tex.

Crim.App.1991) (citations omitted); *Jackson v. Virginia*, 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard of review in a case involving circumstantial evidence is whether the circumstances "exclude every other reasonable hypothesis except that of guilt of the defendant." *Humason v. State*, 728 S.W.2d 363, 366 (Tex.Crim.App.1987) (citation omitted), *overruled, Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991) (reasonable hypothesis standard no longer applicable for cases tried after November 6, 1991).

To establish unlawful possession of a controlled substance, the State must prove (1) that the accused exercised care, custody, control or management over the contraband; and (2) that the accused knew the matter possessed was contraband. *Martin v. State*, 753 S.W.2d 384, 387 (Tex. Crim.App.1988); *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex.Crim.App.1985); *Deshong v. State*, 625 S.W.2d 327, 329 (Tex.Crim.App.1981). While possession need not be exclusive, and facts and circumstances may be sufficient to show an accused possessed a narcotic drug, there must be some affirmative link existing between the person accused and the narcotic drug. *Hausman v. State*, 480 S.W.2d 721, 723 (Tex.Crim.App.1972).

The affirmative links made in the present case include Castillo's testimony that he saw appellant holding drug paraphernalia in a room in Willie's apartment, that "they" were smoking cocaine, that appellant went in the bathroom, screamed, made a loud noise and then returned to the room with a towel around her waist and started smoking cocaine, that a stillborn infant with .04 milligrams of cocaine in his liver was later found in the apartment and that DNA testing confirmed the infant as appellant's child. This case is difficult in determining the sufficiency of evidence, because of the unusual nature of this case. The State attempts to link appellant to possession of cocaine because of the circumstances that indicated cocaine may have been used in the apartment and because a stillborn child found in the apartment and later identified as having been

born from appellant had .04 milligrams of cocaine in its liver. This is definitely unlike cases where the owner of a car or dwelling where the narcotics is discovered is linked to possession because of his dominion and control over the place where the narcotics is found. In this case, appellant is linked because of her maternal relationship to the person containing cocaine. Not only has no Texas court held that a mother could be held in possession of narcotics because of residual drugs found in her infant, but no Texas court has held that a person could be held in possession of narcotics because residual of drugs found in his or her body. The weight of authority in other jurisdiction holds, without other evidence, the mere presence of a controlled substance in a person's body does not constitute possession within the meaning of criminal controlled substance statutes. *See State v. Vorm*, 570 N.E.2d 109 (Ind.App. [4th Dist.] 1991) (evidence of cocaine metabolites in urine sample, without additional evidence, does not constitute prima facie evidence of knowing and voluntary possession of cocaine); *State v. Thronsen*, 809 P.2d 941 (Alaska App.1991) (Thronsen could not be convicted of possession of cocaine "in his body" because he had no control over the cocaine); *State v. Lewis*, 394 N.W.2d 212 (Minn.App.1986) (mere presence of controlled substance in defendant's urine specimen not sufficient circumstantial evidence to prove, beyond a reasonable doubt, prior possession by defendant of controlled substance, absent probative corroborating evidence of actual physical possession); *State v. Hornaday*, 105 Wash.2d 120, 713 P.2d 71, 75 (1986) (once narcotic is injected into the body it is no longer in the individual's control for purposes of possession); *State v. Flinchpaugh*, 232 Kan. 831, 659 P.2d 208 (1983) (drug in person's blood can be used as circumstantial evidence for proof of prior possession, but not sufficient evidence to establish guilt, since the drug could have been injected involuntarily or introduced by artifice).

We recognize the cases cited by the State in revocation proceedings where a person may be found in violation of probation if a drug test confirms that a person has used drugs, but those cases are worlds apart from a drug *possession* case. Revocation of probation can be based upon violating a condition of probation even though violating that condition is not itself a separate crime. See TEX.CODE CRIM.PROC.ANN. art. 42.12 secs 11 and 24 (Vernon Supp.1992). In Texas, a basic condition of probation includes submitting to testing for controlled substances. *Id.* sec. 11(a)(15) and (g). Another standard condition, to "avoid injurious or vicious habits" can also be implied to include failing a positive test for a controlled substance. *Id.* at 11(a)(2). Therefore, failing a drug test is usually a violation of the conditions of probation for which the person on probation has due notice can amount to revocation of probation.

The results of a test for drugs in bodily fluids does not satisfy the elements of the offense of possession of cocaine. To hold such today would amount to changing the offense of possession of cocaine to "use of cocaine" and the United States Supreme Court has made clear that such an offense would violate the Eighth Amendment without proof of possession at a particular time and place. *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1420–21, 8 L.Ed.2d 758 (1962) ("We hold that a state law which imprisons a person thus afflicted [narcotics addiction] as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment."). The only proof of appellant's possession of the cocaine found in the infant to a particular time and place is Castillo's testimony that "they" were smoking cocaine in the room prior to the time that appellant left the room and supposedly delivered the baby. Even if we infer that "they" meant appellant was smoking cocaine before she delivered a stillborn infant that contained cocaine, and that this biological link would be sufficient to prove possession of cocaine, there was no testimony as to when this cocaine was ingested. The only testimony was as follows:

[Prosecutor] Q: What was the cause of the death of this child?

[Dr. Brown] A: This was a stillborn infant and in my opinion the massive dose of cocaine that was on board *or that the baby had accumulated* caused this death.

[Prosecutor] Q: Can you take us through mechanically how that happened?

[Dr. Brown] A: The mother's blood whenever she smokes or ingests or snuffs or sniffs or shoots up cocaine that gets into her bloodstream and that's carried through the umbilical cord into the placenta. Once it gets into the placenta it goes into the placenta and then through the umbilical cord to the baby. That's how the baby accumulates the cocaine.

[Prosecutor] Q: Now, what is the mechanics of the cocaine working to cause the demise of the fetus?

[Dr. Brown] A: What happens in a number of instances is that the cocaine is a vasoconstrictor. Once cocaine is in the bloodstream of the mother she becomes hypersensitive, and also the cocaine actually affects the vessels of the placenta and of the baby and causes a constriction down of the blood vessels. Therefore, the baby does not get its proper nutrients through the bloodstream because of the constriction of the vessels.

[Prosecutor] Q: How did this lack of oxygen and nutrients affect the vital organs, the brain and heart of the child?

[Dr. Brown] A: Well, it can starve them to death for oxygen or for nutrients and *eventually* they can die from that.

[Prosecutor] Q: Once this process of constricting those vessels and the umbilical cord occurs how long before death? Do you have an opinion of that?

[Dr. Brown] A: No, I don't.

\* \* \* \* \* \*

[Prosecutor] Q: Dr. Brown, can you tell us a little bit about cocaine? Can you tell us, sir, what the lifetime of cocaine in a person's body is, how long it stays there?

[Dr. Brown] A: A half life is estimated 45 minutes to an hour and a half. In other words it's a quick-acting drug, and you're always excited, too. In other words, it's picked up in the urine very quickly after it's sniffed or used with intravenous injections or whatever.

[Prosecutor] Q: Now, you're talking about this for size of the baby he normally has quantities of cocaine found there. *Does the cocaine stay there upon the death of the fetus?*

[Dr. Brown] A: *Yes.*

[Prosecutor] Q: *So, the half life is not relevant to us at this point, is it, in terms of determining how long the cocaine has been there?*

[Dr. Brown] A: *No. There is only a small period of time in which the catalyzation or metabolism of cocaine occurs right after death, but your enzyme systems and all other physiological functions shut down with death.*

[Prosecutor] Q: Do you have an opinion, sir, by virtue of the half life of cocaine that you said is very short, a ballpark opinion, sir, of time that the mother therefore must have ingested cocaine *in advance of the death of the fetus?*

[Dr. Brown] A: Oh, within a couple of hours, probably within an hour, but I don't know. It depends on how massive the dose was the mother had taken.

[Prosecutor] Q: *A very short period of time before the baby actually died cocaine was ingested* into the mother and then into the baby?

[Dr. Brown] A: Yes.

(emphasis added)

This testimony confirms that cocaine was ingested by appellant *before the infant died,* but it does not confirm *when* this cocaine was actually ingested *by appellant.* It is the link to appellant's ingestion of cocaine that is required if we are to accept the State's theory of possession. Although the doctor's testimony makes clear that the infant died shortly after ingestion of cocaine, it does not confirm when this death occurred. Much of the doctor's testimony indicates that the cocaine may have accumulated in the baby

over time. Also, the infant could have died at any time shortly after the ingestion of cocaine and did not abort until much later. The birth of a stillborn child does not indicate the time of death. The only reference to the time of death is in relation to the time that ingestion of cocaine occurred. There is no testimony indicating that the baby probably died and spontaneously aborted after Castillo supposedly saw appellant ingest cocaine. The doctor's testimony confirms that the half life of cocaine is not relevant in terms of determining how long the cocaine has been in the baby, because the body's functions shut down with death and the cocaine stays in the infant once it dies. As a result, the cocaine could have been in this dead infant for a long time prior to the actual spontaneous abortion. Accordingly, there was no testimony linking the alleged cocaine Castillo saw that "they" were smoking at that particular time and place to the cocaine found in the infant. Because the cocaine ingestion could have occurred at any time, in any place, a rational trier of fact could not exclude the reasonable hypothesis that the infant was ingested with cocaine at a time or place other than when Castillo observed "they" were smoking the alleged cocaine.

Also, even if the evidence of the stillborn's child's diagnosis is considered merely as a strong inference, taken together with other circumstances to find appellant was in possession of cocaine, we find a rational trier of fact could not find all the essential elements of the offense beyond a reasonable doubt. As noted above, the first element the State must prove to establish unlawful possession of a controlled substance is that the accused exercised care, custody, control or management over the contraband. Appellant's care, custody, control or management over the cocaine at a particular time and place in the present case is based solely on Castillo's testimony. All other testimony concerned observations of drug paraphernalia and Cooper's testimony that she saw a plate of cocaine in the apartment. Castillo was the only person who claimed to have seen appellant handling and smoking what he thought to be cocaine. Castillo's testimony was that he had never used cocaine and that this was the only occasion that he had ever seen it, but that he knew exactly what it looked like and that appellant handled and smoked cocaine. This testimony was insufficient to establish possession since Castillo stated no basis for his belief that the substance was cocaine other than his a positive attitude that he did see it. *See Curtis v. State*, 548 S.W.2d 57, 59 (Tex.Crim.App.1977) (although an experienced officer may be qualified to testify that a green leafy substance is marihuana, an experienced narcotic officer can not look at a white or brown powdered substance and testify that it is heroin to prove that the substance is heroin since there are many controlled as well as non-controlled powdered substances that appear in white or brown powdered form). Also, the substance Castillo saw was never analyzed. As stated before, the amount analyzed in the stillborn infant was not linked to what Castillo's observed in the apartment. Viewing the evidence in the light most favorable to the verdict, the most that can be said about the analysis of the baby's liver was that appellant ingested cocaine somewhere at some time prior to the baby's birth. As a result, it cannot be confirmed now on appeal that the substance seen by Castillo in the apartment was the same cocaine found in the infant or that it was cocaine at all.

Cooper, who had been a user for six years, did not see appellant smoke cocaine but saw appellant with paraphernalia typically used by cocaine users. Cooper went to the apartment to purchase or use cocaine. She stated that she believed she saw a plate of cocaine on top of the bar, but did not ingest or purchase the substance and did not see anyone else ingest the substance. She merely supposed that the substance she saw in the apartment was cocaine. That evidence is not probative of whether the particular substance she saw was in fact cocaine. Nor does it establish that appellant exercised care, custody, control or management over the substance that was seen. Also, there is no evidence confirming even a minute specified amount of cocaine possessed by appellant merely by Cooper's observation of

drug paraphernalia or Castillo's observation that he saw appellant handling and smoking what he thought to be cocaine.

Further, the second element the State must prove to establish unlawful possession is that the accused *knew* the matter possessed was contraband. *Martin, supra,* at 387. (emphasis added). This court has announced before, there is no "bright line" amount of a controlled substance that establishes knowing possession. *Campbell v. State,* 822 S.W.2d 776, 777 (Tex.App.—Houston [14th Dist.] 1992, pet. filed). Nevertheless, if the substance seized from the defendant can be seen and measured, it is sufficient to establish that the defendant knew it was a controlled substance. *Id.* (citing *Johnson v. State,* 658 S.W.2d 623, 627 (Tex.Crim.App.1983); *Thomas v. State,* 807 S.W.2d 786, 789 (Tex.App.—Houston [1st Dist.] 1991, pet. ref'd)). In *Campbell,* this court announced that *0.6 milligrams* of cocaine in a matchbox taken from the defendant could not be "knowing" possession without testimony that the cocaine residue was visible to the naked eye or other circumstances to establish knowing possession. *Id.* Even if we assume that the cocaine ingested by appellant was the same cocaine found in the stillborn infant, there was no testimony that *.04 milligrams* of cocaine was visible to the naked eye. As a result, even if we presume appellant ingested the cocaine immediately prior to the spontaneous abortion, it could not be considered as knowing possession. Based on the evidence in this record, a rational trier of fact could not find either element of possession of a controlled substance beyond a reasonable doubt.

We sustain appellant's first point of error. We need not consider appellant's other points of error.

Accordingly, we reverse appellant's conviction and order she be acquitted. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

SEARS, J., concurs in the result only.