The STATE of Ohio, Appellee,

v.

MILLINER, Appellant.

[Cite as *State v. Milliner* (1994), 98 Ohio App.3d 262.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 65852.

Decided Oct. 13, 1994.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *David Sheldon,* Assistant Prosecuting Attorney, for appellee.

*Paul Mancino, Jr.,* for appellant.

---

DYKE, Judge.

Defendant–Appellant, Lloyd Milliner, alias "Floyd Miller," appeals his conviction for aggravated drug trafficking (R.C. 2925.03[A][10]); aggravated robbery (R.C. 2911.01[A][1]) with a firearm specification; permitting drug abuse (R.C. 2925.13); and possessing criminal tools (R.C. 2923.24). In nine assignments of error, appellant claims that he was denied due process of law. Upon review, we find his assignments of error to be without merit. The judgment of the trial court is affirmed.

Five witnesses testified on behalf of the state.

Accomplice, Accra Debose, testified that on the morning of January 25, 1993, appellant recruited him, Umar Clark, Maurice Marbury and appellant's half-

brother, Robert Bledsoe, to deliver five kilos of cocaine for $105,000 to $110,000 to Marty Goldfab, a contact identified by appellant's cousin, Janissa Jordan. Debose stated that appellant further directed them to steal the money after Jordan delivered the drugs. Debose testified that appellant directed Clark to drive the delivery car, Jordan to carry the drugs to the buyer's car, Bledsoe to drive the robbery car, and Marbury to hold a gun to the buyer's head while he (Debose) took the money. Debose identified the gun and stated that he saw Marbury take the weapon from a brown station wagon parked outside appellant's mother's house, a location where appellant met with participants before they left for the scene of the transaction. Debose stated that as he fled from the scene after the sale and robbery, he saw appellant at a nearby intersection, in the station wagon from the gun was taken. Debose admitted that he lied in the first written statement given to the police, as he failed to describe appellant's involvement. However, he testified that his second written statement and testimony at trial were true.

Appellant's cousin, Janissa Jordan, testified that her boyfriend, Marty Goldfab, asked her if she knew anyone who could supply him with five to ten kilos of cocaine. She stated that on Friday, January 22, 1993, Marty was at her home and that she placed a call to appellant, who was at the home of a mutual cousin named Lasonya Bryant.[1] Jordan testified that she told appellant over the phone that Marty was interested in purchasing cocaine. She stated that appellant told her that he would deal with Marty. She also stated that she handed the phone to Marty, who spoke with appellant about the deal at that time. Jordan corroborated Debose's testimony that appellant met with the participants at his mother's house prior to the planned sale and robbery. Jordan stated that appellant told her to ride with Clark to a BP station on 130th Street and to deliver the drugs to Marty. After her arrest, Jordan gave a written statement to the police and testified consistent with that statement at trial. She also received a reduced sentence in exchange for her testimony.

Drug Enforcement Administration ("DEA") agent Tony Sargin testified that Jordan's boyfriend, Marty Goldfab, served as a reliable information source. He stated that Marty informed him of the deal and gave him the phone number of an individual named "Floyd." Sargin stated that he contacted "Floyd" and, via taped phone conversations, "Floyd" agreed to sell him five kilos of cocaine for $105,000. These conversations were played for the jury. Sargin testified that on January 25, 1993, Janissa Jordan carried a duffle bag to his car. He explained that he became concerned that something was going wrong with the deal because

---

1. Jordan's testimony was disputed by Bryant, who testified on behalf of the defense. She testified that appellant was at her home when Jordan called.

the bag contained three rather than five packages and because the packages were wrapped in an unusual manner. He stated that immediately after the delivery, appellant's half-brother, Robert Bledsoe, rammed the car he was driving into his car, pinning it against a rear utility pole. Sargin stated that Maurice Marbury then jumped out of Bledsoe's car, held a gun to his head, and demanded money. Sargin stated that he took control of the weapon and that all five suspects were arrested.

Investigating Officer Henry O'Bryant testified that Jordan and Bledsoe implicated appellant as the mastermind of the deal in written statements made immediately after their arrest.

Five witnesses testified on behalf of the defense. Three witnesses testified as to appellant's good character. Lasonya Bryant, appellant's cousin, testified that the reason Accra Debose and Umar Clark came to her apartment on the morning of the sale was because she had just begun dating Debose. On rebuttal, however, Debose denied knowing Bryant and stated that he and Clark went to Bryant's apartment because appellant directed him to pick up the cocaine there. On cross-examination, Bryant admitted that she allowed Clark, a total stranger, to make several phone calls and that Clark told her that if anyone called looking for "Floyd," he (Clark) would call or beep them back.

Appellant took the stand and denied involvement in the crimes. He stated that he let Clark borrow his car and that he was picking up his wife's car at her place of employment at the time of the sale and robbery. He identified the voice on the tape, alleged to be "Floyd," as the voice of his long-time friend, Umar Clark. He also admitted giving his alias name to officers who stopped him for speeding less than an hour before the sale.[2] The jury found appellant guilty of all but the felonious assault charge. The instant appeal followed.

I

"The defendant was denied due process of law when he was convicted under the first count of the indictment for selling or offering to sell cocaine when the actual substance involved in the transaction was counterfeitt [*sic*]."

█ In his first assignment of error, appellant, relying on R.C. 1.51 and *State v. McDonald* (1987), 31 Ohio St.3d 47, 31 OBR 155, 509 N.E.2d 57, argues that the more specific statute of trafficking in a counterfeit controlled substance, to wit, R.C. 2925.37, applies to his conduct because cocaine was never mentioned

---

2. This admission was corroborated by Debose, and motor vehicle citations in the name of "Floyd Miller" were entered into evidence.

during taped telephone conversations and because the substance actually transferred was counterfeit.[3] Appellant's argument is without merit.

In *State v. Chippendale* (1990), 52 Ohio St.3d 118, 556 N.E.2d 1134, the Supreme Court of Ohio specifically limited the application of R.C. 1.51 in the following manner:

"R.C. 1.51 comes into play only when a general and a special provision constitute allied offenses of similar import and additionally do not constitute crimes committed separately or with a separate animus for each crime." (Emphasis omitted.) *Id.* at 120, 556 N.E.2d at 1137.

In *State v. Mughni* (1987), 33 Ohio St.3d 65, 514 N.E.2d 870, the Supreme Court of Ohio determined that knowingly selling or offering to sell a controlled substance, R.C. 2925.03(A)(1), and knowingly selling or offering to sell a counterfeit controlled substance, R.C. 2925.37(B), were not allied offenses of similar import. Hence, R.C. 1.51 does not apply to the instant case.

The fact that cocaine was not mentioned in tape-recorded conversations is unpersuasive. Debose and Jordan testified that appellant set up the entire transaction and told them that the deal involved five kilos of cocaine. The purchase price of $105,000, set by appellant, confirms the fact that appellant intended those he involved in the scheme to believe that the substance to be transferred was cocaine. Hence, appellant, through his operatives, knowingly offered to sell cocaine in violation of R.C. 2925.03(A)(1). Appellant's first assignment of error is overruled.

## II

"The defendant was denied due process of law when the court failed to instruct the jury as to all of the elements needed to be proven to convict the defendant of selling or offering to sell cocaine."

■ In his second assignment of error, appellant claims that the court failed to instruct the jury on the requisite mental state of "knowingly" selling or offering to sell cocaine. Appellant's assignment of error is without merit. The record demonstrates that the court defined the term "knowingly" and advised jurors that before they could convict appellant on any of the indicted offenses, they must find that the defendant acted "knowingly."[4] Moreover, appellant failed to object

---

3. The substance transferred was determined to be cornmeal and flour.

4. At page 423 of the transcript the court instructed the jury as follows:

"Now I have used some language that relates to intent. I have used the term *knowingly*. The word *knowingly means* that a person is aware of the existence of facts and that his acts will probably cause a certain result and be of a certain nature.

to such alleged omissions. Accordingly, he has waived any such error on review. See Crim.R. 30 and *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Appellant's second assignment of error is overruled.

## III

"The defendant was denied due process of law when the court without notice changed this case to a conspiracy."

In his third assignment of error, appellant claims that because he was indicted and defended as a principal offender, he was prejudiced when the court, without notice, gave jury instructions on the theory of conspiracy. Appellant's assignment of error is without merit.

The record demonstrates that the court instructed the jury not on the theory of conspiracy but on the theory of complicity, with conspiracy being one element of that offense.[5]

"It is well settled that the state may charge and try an aider and abettor as a principal and if the evidence at the trial reasonably indicates that the defendant was an aider and abettor rather than a principal offender, a jury instruction may be given; thus, a defendant, through his attorney, has legal notice of the possibility that the jury might be given a complicity instruction, even thought he has been charged and tried as a principal offender." *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 408.

Sufficient evidence of solicitation, procurement, aiding, abetting and conspiracy was adduced at trial to warrant an instruction on complicity. Appellant's third assignment of error is overruled.

---

"In this instance, ladies and gentlemen, with regard to all five counts of this indictment, the defendant is charged with these specific crimes specific crimes under the theory of complicity. Under the theory of complicity the *defendant could not be convicted* of any offenses *unless you found beyond a reasonable doubt that the defendant knowingly* solicited, procured another to commit the offense, any of the offenses that are charged in the indictment, or that the defendant aided or abetted another in committing the offense, any of these offenses, or that the defendant conspired with another to commit the offenses set forth in counts *1* through 5 of the indictment." (Emphasis added.)

5. R.C. 2923.03, complicity, provides in relevant part that:
"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
"(1) Solicit or procure another to commit the offense;
"(2) Aid or abet another in committing the offense;
"(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code[.]"

## IV

"The defendant was denied due process of law when the jury was instructed on a conspiracy and the evidence, at most, shows a conspiracy but defendant was sentenced to a term of life imprisonment and other terms of imprisonment as if he committed the substantive offenses."

In his fourth assignment of error, appellant claims that the court instructed the jury on the theory of conspiracy and, hence, the lesser penalties specified in R.C. 2923.01(J) should apply.[6] Once again, appellant's assignment of error is inaccurate and without merit. As stated *supra,* the trial court instructed the jury not on a theory of conspiracy, but on a theory of complicity. Contrary to appellant's assertions, he was convicted as an accomplice, not as a conspirator.

R.C. 2923.01(K), conspiracy, provides in relevant part that:

"This section does not define a separate conspiracy offense or penalty where conspiracy is defined as an offense by one or more sections of the Revised Code, other than this section."

Committee Comments which immediately follow the above-cited section provide in relevant part that:

"Although this section does not replace any other conspiracy offenses defined in the Revised Code, the rules, *exceptions,* and defenses defined in this section are expressly made applicable to such other offenses." (Emphasis added.)

Thus, R.C. 2923.01(K) provides that if "conspiracy" is defined as an offense by another section of the Revised Code, to wit, the complicity section, then R.C. 2923.01(J) is specifically excepted as the applicable penalty provision and the penalty provision of the other defining section applies.

The penalty provision for complicity, to wit, R.C. 2923.03(F), provides that:

"Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted *and punished as if he were a principal offender."* (Emphasis added.)

Hence, appellant was properly sentenced as a principal on four of the five offenses for which he was convicted. His fourth assignment of error is overruled.

## V

"The defendant was denied due process of law when the court made an obvious misstatement of the law[;] based upon this misstatement of the law the defendant is entitled to a judgment of acquittal."

---

6. R.C. 2923.01(J) specifies the penalties associated with a conviction for conspiracy within the conspiracy section of the Revised Code.

Appellant's fifth assignment of error is without merit. The record fails to demonstrate that the court misstated the law. While page 427 of the transcript demonstrates the word "acquitted" instead of the correct word "convicted," an affidavit submitted by the court reporter indicates that the error was a transcription rather than an instruction error. Hence, the jury received the proper instruction. Appellant's fifth assignment of error, is overruled.

## VI

"The defendant was denied due process of law when the court permitted a conviction to result from improper inducements made to witnesses for the prosecution."

In his sixth assignment of error, appellant claims that the court improperly permitted the state to propose a contingency agreement, whereby Debose and Jordan would receive reduced sentences *if* the state was successful in obtaining a conviction. Appellant's argument is unpersuasive.

The record demonstrates that Debose and Jordan entered their guilty pleas and agreed to testify for the state on the day before trial. The record fails to demonstrate that their sentence reductions were contingent on the outcome of the trial. The only condition imposed on their sentence reductions by the state was that their testimony had to be truthful. Appellant's sixth assignment of error is overruled.

## VII

"The defendant was denied due process of law when the court overruled motions for judgment of acquittal and failed to grant a new trial in this case."

In his seventh assignment of error, appellant claims that the evidence presented by the state was insufficient to support the jury's verdict.

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.) *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

■ Accra Debose and Janissa Jordan testified that appellant controlled and directed every aspect of the drug sale and robbery. Jordan and appellant's half-brother, Bledsoe, implicated appellant immediately after their arrest.[7] Moreover, the jury heard tape-recorded conversations between DEA Agent Tony Sargin and an individual referred to as "Floyd," appellant's alias name. Appellant and Lasonya Bryant identified the voice of "Floyd" as that of appellant's long-time friend, Umar Clark. Appellant testified that he let Clark borrow his car. Debose and Jordan testified that appellant directed Clark to drive Janissa Jordan to the scene.

It is fundamental that the credibility of the witnesses and the weight to be given to the evidence are primarily for the triers of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212.

Under *Eley* and *DeHass*, a jury could reasonably find that appellant knowingly aided and abetted the sale of or offered to sell five kilograms of cocaine. A jury could also find that appellant directed that a firearm be used in the commission of a robbery, that he permitted drug abuse, and that his vehicle and weapon were used as criminal tools. Appellant's seventh assignment of error is overruled.

## VIII

"The defendant was denied due process of law when the term 'offer' was defined in a manner which required less than what is required to prove an attempt yet defendant was convicted and faced the same penalty as if the offense has been consummated."

Appellant's eighth assignment of error is without merit.

The record demonstrates that appellant was convicted of selling or offering to sell cocaine exceeding one hundred times the bulk amount in violation of R.C. 2925.03(A)(10).

R.C. 2925.03(A)(10) provides in relevant part that:

"(A) No person shall knowingly do any of the following:

" * * *

"(10) Sell or offer to sell a controlled substance in an amount equal to or exceeding one hundred time the bulk amount[.]"

■ In order to prove a violation of R.C. 2925.03, appellee need only prove that an "offer to sell" had been made. Janissa Jordan testified that appellant agreed to sell cocaine to Marty. Detective Sargin testified that Marty gave him the

---

7. While Bledsoe became a hostile witness at trial, Jordan's testimony was consistent with her pretrial statement.

phone number of an individual named "Floyd" and that he phoned "Floyd" and set up the instant deal. It was well established that "Floyd" was appellant's alias name and that appellant had masterminded the transaction. Under *DeHass*, it was not unreasonable for the jury to infer that appellant knowingly offered to sell five kilos of cocaine to DEA Agent Tony Sargin via informant Marty Goldfab and his long-time friend, Umar Clark. Appellant's eighth assignment of error is overruled.

## IX

"The defendant was denied due process of law when the court instructed the jury on theory of aiding and abetting with respect to an offer of sale when aiding and abetting is inapplicable to this particular criminal."

Appellant cites no controlling case law in support of his assertion that the theory of complicity is inapplicable to the offense of aggravated trafficking. In *State v. Bennett* (1993), 89 Ohio App.3d 475, 624 N.E.2d 1099, evidence of aiding and abetting was adduced at trial and the defendant was convicted of trafficking after the jury was instructed on complicity. Appellant's ninth assignment of error is overruled. Accordingly, the judgment of the trial court is affirmed. It is so ordered.

*Judgment affirmed.*

SPELLACY, P.J., concurs.

HARPER, J., dissents.

HARPER, Judge, dissenting.

I respectfully dissent from the majority opinion because this is a questionable exercise of the proper use of the power of the state to prosecute criminal offenders. There is no doubt that appellant committed a crime and should be punished, but the issue is the state's calculated disregard to prosecute for the crime that was actually committed, and a subsequent punishment that does not fit the crime. It is disturbing that the majority has seen fit to look the other way and endorse this blatant miscarriage of justice. I cannot fathom any justification for the majority's affirmance of appellant's conviction except to say that the state prosecuted appellant for the sale of cocaine and we cannot tolerate this court's being viewed as soft on a drug-related crime. We have seen drugs destroy the lives of men, women and children. Do we also want to see drugs destroy the Constitution and the Bill of Rights?

Appellant argues in his first assignment that his conviction for selling or offering to sell a controlled substance was a violation of his due process rights

because he did not offer to sell any controlled substance but only a counterfeit substance. He argues that he should have been prosecuted under a specific statute, R.C. 2925.37, which prohibits any offering to sell or selling of a counterfeit substance and not under R.C. 2925.03 as charged. Appellant further argues that at no time did the state offer any evidence that appellant ever used the word "cocaine" in all his alleged conversations with the agent.

The state argues that appellant was properly charged because R.C. 2925.37 and 2925.03 are not allied offenses of similar import. The state cites two Ohio Supreme Court cases, *State v. Mughni* (1987), 33 Ohio St.3d 65, 514 N.E.2d 870, and *State v. Chippendale* (1990), 52 Ohio St.3d 118, 556 N.E.2d 1134, to support its case.

In *Chippendale,* the issue was whether a defendant who was charged under R.C. 2903.04(B) and 2903.06 could be convicted on both charges and sentenced on both convictions. Thus, *Chippendale* is improperly applied by both the state and the majority.

As noted by the Ohio Supreme Court in *State v. Collins* (1993), 67 Ohio St.3d 115, 116, 616 N.E.2d 224, 225:

"*Chippendale* dealt with whether involuntary manslaughter and aggravated vehicular homicide could both be charged from the same conduct. The case did not consider the sufficiency of the underlying violation to support a charge of involuntary manslaughter. Indeed, we did not need to do so as the defendant's involuntary manslaughter charge was predicated upon the first degree misdemeanor offense of driving under the influence. R.C. 4511.19(A)."

The issue before us in the instant case is not that of allied offenses because, as the majority correctly points out, the two offenses are not allied; nor was appellant charged with the two offenses. The issue is whether the state can ignore a specific statute and charge on a general statute, where the general statute is not a later provision, nor is there any manifest intent of the legislature to have the general provision apply. There cannot be a question that the two statutes' effects on society are distinct. Thus, the legislature could not intend to have one substitute for the other at the convenience of the state, as R.C. 2925.37 was enacted later specifically to differentiate the two laws and avoid the application given to the law of drug trafficking in the instant case by the state and approved by the majority.

In *Chippendale, supra,* 52 Ohio St.3d at 120–121, 556 N.E.2d at 1137, the Ohio Supreme Court held:

"Where it is clear that a general provision of the Criminal Code applies coextensively with a special provision, R.C. 1.51 allows a prosecutor to charge on

both. Conversely, where it is clear that a special provision prevails over a general provision or the Criminal Code is silent or ambiguous on the matter, under R.C. 1.51, a prosecutor may charge only on the special provision. The only exception in the statute is where '* * * the general provision is the later provision and the manifest intent is that the general provision prevail.' Thus, unless the legislature enacts or amends the general provision later in time and manifests its intent to have the general provision apply coextensively with the special provision, the special provision must be the only provision applied to the defendant."

The prosecution of a crime must be based strictly on the provisions of the law, and the state must not use its power as shown in the instant case to substitute one provision for the other in contravention of the law for the simple reason that it has the power to do so and also can achieve a longer sentence. The achievement of a longer sentence, as prudent as it might appear emotionally and sentimentally, still must take a back seat to the constitutional protection of due process under the law. For the rule of statutory construction remains that penal laws "shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A); *State v. Collins, supra.*

R.C. 2925.03 provides in pertinent part as follows:

"(A) No person shall knowingly do any of the following:

"(1) Sell or offer to sell a controlled substance in an amount less than the minimum bulk amount;

"(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, when the offender knows or has reasonable cause to believe the controlled substance is intended for sale or resale by the offender or another;

"(3) Cultivate, manufacture, or otherwise engage in any part of the production of a controlled substance;

"(4) Possess a controlled substance in an amount equal to or exceeding the bulk amount but in an amount less than three times that amount;

"(5) Sell or offer to sell a controlled substance in an amount equal to or exceeding the bulk amount, but in an amount less than three times that amount;

"(6) Possess a controlled substance in an amount equal to or exceeding three times the bulk amount, but in an amount less than one hundred times that amount;

"(7) Sell or offer to sell a controlled substance in an amount equal to or exceeding three times the bulk amount, but in an amount less than one hundred times that amount;

"(8) Provide money or other items of value to another person with the purpose that the recipient of the money or items of value would use them to obtain controlled substances for the purpose of selling or offering to sell the controlled substances in amounts exceeding a bulk amount or for the purpose of violating division (A)(3) of this section;

"(9) Possess a controlled substance in an amount equal to or exceeding one hundred times the bulk amount[.]"

R.C. 2925.37 provides in part as follows:

"(A) No person shall knowingly possess any counterfeit controlled substance.

"(B) No person shall knowingly make, sell, offer to sell, or deliver any substance that he knows is a counterfeit controlled substance."

R.C. 2925.01 defines "counterfeit substance" as follows:

"(P) 'Counterfeit controlled substance' means any of the following:

"(1) Any drug that bears, or whose container or label bears, a trademark, trade name, or other identifying mark used without authorization of the owner of rights to such trademark, trade name, or identifying mark;

"(2) Any unmarked or unlabeled substance that is represented to be a controlled substance manufactured, processed, packed, or distributed by a person other than the person that manufactured, processed, packed, or distributed it;

"(3) *Any substance that is represented to be a controlled substance but is not a controlled substance or is a different controlled substance;*

"(4) *Any substance other than a controlled substance that a reasonable person would believe to be a controlled substance because of its similarity in shape, size, and color, or its markings, labeling, packaging, distribution, or the price for which it is sold or offered for sale.*"   (Emphasis added.)

R.C. 2925.37 is clearly a specific statute as opposed to R.C. 2925.03, which is a general statute.   R.C. 1.51 provides:

"If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both.   If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail."   See *State v. Volpe* (1988),

38 Ohio St.3d 191, 527 N.E.2d 818; *State v. Chippendale, supra; State v. Frost* (1979), 57 Ohio St.2d 121, 11 O.O.3d 294, 387 N.E.2d 235.

In *Volpe*, the Ohio Supreme Court held that where there is no manifest legislative intent that a general provision of the Revised Code prevail over a special provision, the special provision takes precedence. See, also, *State v. Farkas* (1989), 64 Ohio App.3d 224, 227, 580 N.E.2d 1154, 1156. There is no discretion conferred upon the state to make a choice as to when a general statute should prevail over a specific statute. The state is bound to follow the mandates of the statute even when such would create potential harsh results, for the authority to amend the statute and to avoid potential harsh results remains the problem of the Ohio legislature. See *Abraham v. Natl. City Bank* (1990), 50 Ohio St.3d 175, 178, 553 N.E.2d 619, 622. There being no controversy as to which provision of the statute is specific and which is general, appellant should have been charged with the specific statute.

A second issue presented in the instant case is appellant's sentence of life imprisonment. It is inconceivable that the legislature intended to sentence an accused to life imprisonment for selling cornmeal as the substance in the instant case was revealed to be. The evidence presented by the state shows that appellant sold to the police a counterfeit substance (cornmeal) which even though the police may have believed it be cocaine, before the sale was consummated, nonetheless was cornmeal. Thus, appellant was convicted for selling cornmeal and not cocaine.

The United States Supreme Court held in *Solem v. Helm* (1983), 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637, 649, that "no penalty is per se constitutional." See, also, *Robinson v. California* (1962), 370 U.S. 660, 667, 82 S.Ct. 1417, 1421, 8 L.Ed.2d 758, 763. Thus, a criminal sentence must be proportionate to the crime for which defendant has been convicted. *Solem, supra;* see, also, *State v. Gilham* (1988), 48 Ohio App.3d 293, 294, 549 N.E.2d 555, 556. While I do not consider R.C. 2925.03 penalties unconstitutional if applied properly, I do, however, question the use of an R.C. 2925.03 penalty to achieve that which could not be achieved by prosecuting under the crime that was committed.

As stated by Justice Herbert R. Brown in his dissent in *State v. McDonald* (1987), 31 Ohio St.3d 47, 52–53, 31 OBR 155, 159, 509 N.E.2d 57, 62:

"The Eighth Amendment to the Constitution of the United States proclaims: 'Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*' (Emphasis added.) Section 9, Article I of the Ohio Constitution contains identical language, and the protection provided under the two clauses is essentially the same. See, *e.g., State v. Chaffin* (1972), 30 Ohio

St.2d 13, 59 O.O.2d 51, 282 N.E.2d 46; *McDougle v. Maxwell* (1964), 1 Ohio St.2d 68, 30 O.O.2d 38, 203 N.E.2d 334.

> *"Deeply ingrained within the prohibition against cruel and unusual punishment is the concept that the penalty for an offense must be proportionally related to its severity. Thus, the Eighth Amendment and its Ohio counterpart prohibit ' * * * not only barbaric punishment, but also sentences that are disproportionate to the crime committed.' Solem v. Helm* (1983), 463 U.S. 277, 284 [103 S.Ct. 3001, 3006, 77 L.Ed.2d 637, 645]." (Emphasis added.)

Appellant's sentence to life imprisonment for offering to sell cornmeal is a cruel and an unusual punishment, which makes the application of R.C. 2925.03 to this case unconstitutional. There is no evidence in the legislative history of the counterfeit laws or the drug laws to support a legislative intent to sentence an accused to life imprisonment for selling a counterfeit substance regardless of what the purchaser of the substance thought. It should not be the embarrassment that one faces when duped into buying what is not a controlled substance that is the impetus behind the punishment for drug offenses. The state should not use its power to punish a person who dupes it when the same enthusiasm to seek life imprisonment would not exist on behalf of a common citizen who complains to the state of being duped by another, albeit for the same set of facts as in the within case.

It is, therefore, my opinion that the crime of selling a counterfeit substance is insufficient to support a charge for a more serious offense of selling a controlled substance under R.C. 2925.03. Since appellant's charge was predicated upon the first degree misdemeanor of selling a counterfeit substance which the state knew was a counterfeit substance before the charges were instituted, his conviction should have been under a specific statutory provision of selling a counterfeit substance.

Accordingly, I respectfully dissent.