[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15564
Non-Argument Calendar
_____

D.C. Docket No. 5:13-cv-00051-LGW-JEG

JERMAINE R. REVERE,

Plaintiff-Appellant,

versus

BRIAN OWENS, et al.,

Defendants,

DONNIE BUSSY,
JERRY T. WATERS,
DARYLL HART,
LARRY R. PERRY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 24, 2016)

Before TJOFLAT, HULL and WILLIAM PRYOR, Circuit Judges.

PER CURIAM:

This case involves an inmate on inmate assault that took place at Ware State Prison (WSP) in Georgia on June 26, 2012. Jermaine R. Revere lost parts of two fingers and suffered other serious wounds during the assault, and proceeding *pro se*, he seeks damages under 42 U.S.C. § 1983 against four prison officials, Warden J. Derrel Hart, Lt. Jerry T. Waters, and Sgts. Donnie Bussey[1] and Larry R. Perry. Revere alleges that each official, in violation of the Eighth Amendment, was deliberately indifferent to the substantial risk of serious harm he faced, as a member of a gang, Gangster Disciples, and the hands of Hispanic inmates.[2] Rather than keeping him out of harm's way, they left him exposed to the assault that occurred.

The District Court, concluding that the evidence taken in the light most favorable to Revere failed to show that any of the four officials violated the Eighth Amendment as alleged, granted the four officials summary judgment. Revere appeals the judgment. We affirm.

---

[1] Bussey is named in Revere's complaint as Bussy. We refer to his correct surname, Bussey.

[2] The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII. The Cruel and Unusual Punishment Clause is applicable to the States through the Fourteenth Amendment's Due Process Clause. *Robinson v. California*, 370 U.S. 660, 675, 82 S. Ct. 1417, 1425, 8 L.Ed.2d 758 (1962).

I.

We review the summary judgment *de novo*, considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party, Revere.  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).  Revere's Eighth Amendment claim is based for the most part on his fear, as expressed to each of the four officials individually, of being housed amongst Hispanic inmates.  Revere related on deposition precisely what he said to these officials; thus, in setting out the salient facts, we focus primarily on his testimony.  We begin, however, with a brief description of WSP and the circumstances that led to Revere's incarceration there.

WSP opened in 1990 as a "Tier I & II Facility" designed to house 1546 inmates.  The facility consists of eight housing units with 50 double cells in each, an Infirmary of 12 beds, a Segregation unit with 150 beds, and a Fast Track Unit of four dormitories of 54 beds each.[3]  The prison's staff includes a CERT Team charged with maintaining order.[4]  The inmates incarcerated at WSP are "close

---

[3] GEORGIA DEPT. OF CORRECTIONS, 2016 CERT AND TACT UNITS FACT SHEET, http://www.dcor.state.ga.us/sites/default/files/CERTandTACTFactSheet_2016.pdf.

[4] *Id.*  A CERT Team's function is "[t]o maintain well-trained and highly motivated units, ready to mobilize upon command and move quickly to restore law and order within facilities and assist all departmental staff with daily organizations and operations of the facilities."  *Id.*  The team consists of a leader, generally a sergeant, and four correctional officers.  The team receives "extensive training on managing non-compliant offenders in day to day facility operations."  *Id.*  Among other things, the team conducts unannounced "'shakedowns' to detect and prevent the introduction of contraband, prevent escapes and other disturbances and discover hazards to health or safety that may go unnoticed during a routine inspection."  *Id.*

security offenders with behavioral problems,"[5] and that was so during the times relevant here.

The assault occurred during Revere's second incarceration at WSP. Revere was sent to WSP the first time on April 22, 2010, while serving a sentence of 23 years imposed by the DeKalb County Superior Court for manslaughter.[6] He stayed at WSP until March 9, 2011, when he was released on parole. A little over five months later and still on parole, he killed a man with a knife while stealing two motor vehicles, and was indicted by a Fulton County grand jury for murder and theft by taking.[7] On November 9, 2011, while incarcerated at Jackson State Prison, the DeKalb County Superior Court revoked his parole.

Revere was held at Jackson State Prison until Thursday, June 7, 2012, when he was transferred to WSP.[8] Revere arrived at WSP on a bus with 14 other

---

[5] GEORGIA DEPT. OF CORRECTIONS, FACILITY SEARCH: WARE STATE PRISON, http://www.dcor.state.ga.us/GDC/Facility/FacilityMap (then select Ware State Prison from the Facility drop-down menu).

[6] A DeKalb County, Georgia, grand jury had indicted Revere for murder. Pursuant to a plea agreement, he pled guilty to and was sentenced for voluntary manslaughter on January 8, 2004. He began serving his 23-years' sentence that day. Doc. 37-2 (Revere's deposition) at 5. He was transferred to WSP from Rutledge State Prison following a disciplinary infraction. Doc. 37-4 (Movement History) at 3. *See infra* note 8.

[7] Revere was tried on the murder and theft by taking charges in the Fulton County Superior Court on March 5, 2013. The jury found him guilty as charged, and the court sentenced him to life imprisonment for the murder and a consecutive five years for the theft by taking. Doc. 37-2 at 6.

[8] During his incarceration at Jackson State Prison, Revere was cited for disciplinary infractions on four occasions: December 15, 2011, and March 4, April 11 and April 19, 2012. Doc. 37-4 at 2-3. The latter citation involved an altercation that resulted in Revere's hospitalization. Doc. 37-2 at 7.

prisoners.  As he was getting off the bus, the sergeant in charge of CERT's gang task force, recognizing that he had been at WSP before, approached him and said "things have changed," that Sgt. Ivey, a CERT officer, was "no longer with us."[9] As Revere testified on deposition, "[i]t was very well known who I was and who I'm affiliated with."[10]

> I was more like a mediator between the Gangster Disciples and the CERT team as far as like when things transpired.  They said I could bring some type of peace offering to the situation.  So it was well known who I was. . . .  [I]t was numerous occasions that I can pinpoint . . . I've spoken to Warden Hart.  I've spoken with Warden Holden about certain situations.  And they have pulled me out of my cell and put me in the office and was like, well, what's the situation.  What's the status on this situation?  Can you handle this situation?  . . . .  I'm like a mediator or advisor on both ends . . . . [t]he Gangster Disciples and the warden and prison staff.[11]

The intake process began with the prisoners' shaving and taking a shower under the supervision of the same CERT sergeant and an officer member of the gang task force.  When Revere removed his shirt, the sergeant noticed his Gangster Disciples ("GD") tattoos, which covered much of his arms and torso, including a GD 360.  Lt. Berry, who oversaw the CERT operation, happened to be present at

---

[9] The sergeant who approached Revere is unnamed and is not a party in this appeal.

[10] Doc. 37-2 at 8.

[11] *Id.* at 12.  According to Revere, the Gangster Disciples ("GD") "was not brought into reality as a gang.  It was brought about to bring unity within the community, the neighborhood.  Actually, to X out the drug dealers. . . . To make the neighborhood safe."  Doc. 37-2 at 11.  He became a GD at age 13, and had a tattoo around his collarbone with the number 424, which, Revere said, meant "death without dishonor."  *Id.* at 11,12.

the time and told the sergeant that the 360 tattoo indicated that Revere held a high rank in the GD.[12]  The sergeant told Revere that a week or so ago, in late May, some Hispanic and GD inmates had "gone to war" over an incident in Building G and that two GDs had been stabbed and hospitalized.[13]  He was referring to assaults that had occurred on May 29 and 30 in Building G.

After showering, the 15 new inmates were taken to the dining hall for lunch. From there, they went to the infirmary for a physical exam.  That done, the CERT sergeant gave them their cell assignments.  Informed that he would be housed in Building H-1, Revere objected.  The sergeant replied that no other cells were available, but that on Monday, "we'll see what we can do."  After receiving their housing assignments, the inmates were led as a group to their respective cells.  Of the group, 13 were black, three of whom were GD members, Revere, Leach and an unnamed inmate; one was white, an inmate named Clint, also a GD member, and one was Hispanic named Casper.[14]

---

[12] *Id.* at 8-10.  According to Revere, the Gangster Disciples ("GD") "was not brought into reality as a gang.  It was brought about to bring unity within the community, the neighborhood. Actually, to X out the drug dealers. . . . To make the neighborhood safe."  Doc. 37-2 at 11 (Revere deposition).  Revere became a GD at age 13, and had a tattoo around his collarbone with the number 424, which meant "death without dishonor."  *Id.* at 11,12.

[13] *Id.* at 12-13.

[14] *Id.* at 13, 16-17

Revere was assigned to cell 17 in Building H-1. His cellmate was a black man named Mack.[15] Rashad Leach, a GD Revere had known at Jackson State Prison and had arrived at WSP with him, was assigned to cell 18, adjacent to cell 17. His cellmate was a black Muslim. Of the 50 prisoners in H-1, 15 were black. They included two "Crips" and three GDs, Revere, Leach and Tyler Cowan,[16] who was assigned cell 10 on the lower level. And two prisoners were white.[17] The rest were Hispanic.[18]

Around 5:00 p.m. that day, after Revere had settled into his cell, a meeting took place there. Present in addition to Revere, were Leach, Cleve, a GD who worked in the laundry, and one of the two Crips in H-1. They discussed the fight that had taken place between GD and Hispanics in Building G in late May.[19] The meeting ended with the chow call for dinner.

On the way to the dining hall, Revere encountered Solo Rider, a GD housed in Building G. Rider told him that after it "'went down'" in G (referring to the GD encounter with the Hispanics on May 29 and 30), all the GD

---

[15] Mack already had the upper bunk. Revere therefore took the lower bunk.

[16] Doc. 37-2 at 20. Revere and Cowan had been incarcerated together at Jackson State Prison. Cowan came to WSP prior to Revere's June 7, 2012 arrival.

[17] *Id.* 37-2 at 19-20.

[18] We draw this inference from Revere's deposition testimony as a whole.

[19] *Id.* at 21-22. The record is not clear, but at some point on June 7, Revere encountered a GD named Sleazy, whom Revere knew from his previous stay at WSP, who told him not to go in "the bottom," because the Hispanics were "chopping us up." He should "refuse housing," and get "locked up." *Id.* at 15-16.

7

in H "went on the door," i.e., refused housing, and were placed in "segregation." Revere told Rider that he couldn't do that because there were no more cells available in segregation.[20]  At the dining hall, Revere met Sg. Bussey, whom he knew from his earlier incarceration at WSP.  He complained to Bussey about being housed in H-1 with "all these Hispanics," that the CERT Sergeant told him to wait till Monday to request a different cell assignment. [21]  Bussey said he'd have to wait.[22]  On leaving the dining hall, Revere encountered Lt. Waters and voiced the same complaint.  Waters said he couldn't "help" him.[23]

On June 12, Lt. Waters, who was chair of the Classification Committee, interviewed Revere about his housing.  Once again, Revere complained about complained about his cell assignment. Waters, noting that Revere was able to work, said he would see about relocating him to Building M, a Fast Track dormitory.[24]  On June 13, two counsellors came to H-I on a routine visit.  Revere told them that he and one other GD were housed in a building full of Hispanics, and that he was trying to get relocated.

Two days later, on Thursday, June 14, Revere spoke to Warden Hart, while Hart, Warden Holden and a CERT team of a sergeant and two officers were

---

[20] *Id.* at 23.

[21] *Id.* at 23.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 25-26.

conducting a random inspection.[25]  Revere said to Hart, "my understanding [is that] the [GD] and the Hispanics are at war right now. . . . [m]e and one of my brothers [are] in here by ourselves."  Is there "any way possible" to "move us out of here?"[26]  After acknowledging Revere's gangster status, Hart told him that when "'y'all decide to bring a truce, that's when y'll come to me.  Until then, talk to . . . classification.'"[27]

At some point after Revere returned to WSP, Cowan explained to him what had occurred between the GD and Hispanic inmates in Building G on May 29 and 30.  In Revere's words, Cowan related "[t]he history of the whole incident."  It "[a]ll . . .started over a phone," he said.[28]  Revere's reaction was, "We got to stick together. . . . They got the upper hand in here. . . .  We just need to be careful."[29]

After discussing the situation with Cowan, Revere called his mother and stepfather and then, on June 19, he phoned the GD "Governor," "Spike," who was "over all the GD" in Georgia, including those imprisoned.[30]  The Governor, in turn, called the "IC at Ware State Prison, . . . the overseer of the GDs at the compound."  Revere spoke to the IC, Trent, the next day, June 19.  Trent told him that "he sent

---

[25] *Id,* at 24.

[26] *Id.* at 25.

[27] *Id.*

[28] *Id.* at 26.

[29] *Id.* at 27.

[30] *Id.*

some brothers up there to talk to the warden.  He said, 'don't panic. . . . just relax and everything will be all right."[31]  Revere called the Governor again, who said, "I had a brother talk to them. . . . Just be patient.  Be calm. . . . everything will be all right."[32]

On June 25, Warden Hart, a "visitor" from the Georgia Department of Corrections, and a CERT team consisting of two lieutenants and three officers[33] performed an inspection, an "audit," in H-1.[34]  Lt. Berry led the CERT team of three officers.[35]  They searched cell 19 (next to Leach's cell 18), which housed "Nando" and "Marco," found two "machetes" and the makings for two more and confiscated them.[36]

The next day, June 26, Revere went to the chow hall for breakfast at 6:30 a.m.[37]  After breakfast, he returned to his cell and slept.  Around 10:00 a.m., Mack

---

[31] *Id.27-28.*

[32] *Id.* at 28.

[33] *Id.* at 29.  Revere identified Lt. Berry as one of the lieutenants.

[34] *Id.* at 29.  Revere concluded that the visitor was from the Department of Corrections because "[i]t had to be. . . .  That's the only thing I can think of for an audit."  *Id.*  The inmates had been told to be on "standby.  We've got an audit coming up . . . and it's going down today."  *Id.*  They had to be "inspection ready."  *Id.*

[35] *Id.* at 29.

[36] *Id.* at 30.

[37] Officers Strickland and Bennet were in charge of H-1 that day.  Neither are parties in this appeal.

awoke him to say that "somebody just wet up [a Hispanic] on the wall."[38]  He rolled over and went back to sleep.  Soon, Leach entered the cell and told Revere to "get up. . . . These folks are looking crazy."  He said that "a Blood"[39] named Bald in H-2 told him "to wake you up."[40]  Revere got up, walked out of his cell, and observed "two Hispanics holding up a third Hispanic while he unscrewed the little gray box that's over the control booth . . . right by the showers."[41]  Revere thought they were "fixing to hide their phones."[42]

By this time all inmates were up.  The floor sergeant came and announced an inspection.  After Revere returned to his cell to straighten it out, he "went [downstairs to the lower level] and got Cowan.[43]  Revere then returned to his room, brushed his teeth and washed his face.  Meanwhile, the floor sergeant was ordering the inmates to "stand by for inspection."[44]  Not more than three minutes later, Leach's cellmate, the "Muslim," told him, "'go and help your brother.'"  Revere then saw that "Leach was getting stabbed. . . .  They had him pinned to the wall in

---

[38] *Id.* at 32.  "Wet.  Stabbed up. We say wet. . . . .  Somebody just stabbed a Hispanic." *Id.*

[39]  Revere testified that the Bloods "ended up getting stabbed by the [Hispanics] . . . the week after our guys got stabbed" on May 29 and 30.  *Id.* at 31.

[40] *Id.* at 32.  Revere testified that "[e]verybody knows I'm asleep around about this time. *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 33.  "Leach came and got me, and I went and got Cowan."

[44] *Id.*

11

his room. . . .  I'm by Leach's room and I'm steady getting hit."[45]  So I'm fighting

back."[46]  At that point, Revere heard, "'Brother, help me.'"  "I see Leach go up

under the bed . . . .  And . . . they couldn't get to him, so they came at me."[47]

Revere ran past cell 20 to the steps that led to the control booth, getting hit in

the back and neck as he ran.  He got down the steps and fell against the wall.  He

"turned around in time to throw [his] hand by to block [his] face," and his finger

came off."[48]  The "next thing" he knew, the door to the control "pop[ped] open,"

and he ran through the door to safety.[49]

## II.

Prison officials have an Eighth Amendment duty to "take reasonable

measures to guarantee the safety of the inmates."  *Hudson v. Palmer*, 468 U.S. 517,

526–27, 104 S. Ct. 3194, 3200, 82 L. Ed.2d 393 (1984); *Farmer v. Brennan*, 511

U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed.2d 811 (1994).  This duty is such

that an official's "deliberate indifference" to an inmate's "substantial risk of

serious harm" at the hands of another inmate violates the Eighth Amendment.

*Farmer* at 828, 114 S. Ct. at 1974.  To prove a violation, two requirements must be

met.  "First, the alleged deprivation must be, objectively, 'sufficiently serious.'"

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

12

*Id.* at 834, 114 S. Ct. at 1978.  "[T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* "The second requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'. . . [The] prison official must have a 'sufficiently culpable state of mind.'. . . .  [T]hat state of mind is one of 'deliberate indifference' to inmate health or safety."

*Id.* (internal citations omitted).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . .  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.* at 837, 114 S. Ct. at 1979.

With these principles in hand, we consider Revere's claims against the four officials.  His separate claims against Lt. Waters and Sgts. Bussey and Perry fail for lack of any evidence establishing that official was deliberately indifferent to the

13

risk of harm Revere allegedly faced or that if there was a risk, that the official drew the inference that it in fact existed.  On June 7, he encountered Bussey in the dining hall and Waters on leaving the hall and complained to each about being housed in H-1 with "all these Hispanics," but nothing more.  On June 12, when Revere met with Waters for the classification interview, he reiterated the complaint.  Water's response was that he would try to have him reassigned to Building M.  That seemed to satisfy Revere.  On deposition, Revere mentioned Sgt, Perry only once.  He saw Perry after he spoke to Warden Hart.  Perry was "placing some benches inside the dorm area."[50]  And that was all.  In sum, the evidence, taken in the light most favorable to Revere, fails to make out the Eighth Amendment claim alleged.

The evidence bearing on Revere's claim against Warden Hart is more extensive, but it also fails to establish a constitutional violation.  When Revere spoke to Hart on June 14 while Hart and a CERT team were conducting inspections and referred to the war between the GD and Hispanic inmates, Hart was well aware of what Revere was referring to---the assaults that occurred in Buildings G-1 and G-2 on May 29 and 30.  He had received the Department of Corrections incident reports, which described the assaults in detail.

---

[50] *Id.*at 24.

14

The Incident Report of the May 29 assault disclosed that at 9:40 p.m. that day, two black inmates, Jerome Singleton, and Jeremy Saffold, entered the cell of an Hispanic inmate, Rodolfo Santiago, in Building G-1 and asked him for his cell phone.  Santiago refused to give it to him, so he was beaten by Singleton, Saffold and two other black inmates, Derrick Dorsey and Thomas Green.[51]  The stolen phone was recovered in a search of the cell of a fifth black inmate, Marcus Stephens.[52]  A search of the dorm revealed three weapons and 11 pieces of metal, all in the common area.[53]  Earlier in the day, inmate Dorsey assaulted Ignacio Meza, a Hispanic inmate.[54]  Both Santiago and Meza received medical treatment.

The May 30 incident occurred in Building G-2.  At 2:42 p.m., a fight broke out between several black and Hispanic inmates.  The fight was in retaliation of the assault that took place in Building G-1 the day before.  Twelve inmates were involved, and nine weapons were recovered.  Several were treated for injuries.  The inmates were handcuffed, and Buildings G and H were locked down.[55]

Warden Hart was aware that Revere was one of the GD leaders and had served considerable time at WSP.  Moreover, and as Revere testified, he was aware that Revere---during his previous incarceration at WSP---had served as a

---

[51]  The assault was captured by a video camera in the building.  Doc. 37-9 at 2.

[52]  *Id.*

[53]  *Id.*

[54]  *Id.* at 6.

[55]  Doc. 37-10 at 2.

15

"mediator" of inmate disputes. It was therefore reasonable for Hart to tell Revere to negotiate a truce with the Hispanic inmates. If that didn't satisfy Revere, Hart told him to "talk to . . . classification," which had the authority to move him to a different cell. Nothing happened between his conversation with Revere on June 14 and June 26 that would have put Hart on notice that Revere was in imminent danger of the assault that eventually occurred.[56]

### III.

For the foregoing reasons, the judgment of the District Court is

AFFIRMED.

---

[56] We have not overlooked the fact that by his own testimony, Revere left his cell to come to Leach's assistance and in the process involved himself in the assault at issue. It could hardly be argued that Hart or any other member of the WSP staff having knowledge of Revere's desire to be housed away from the Hispanic inmates should be held answerable under Eighth Amendment's Cruel and Unusual Punishment Clause for injuries he received under the circumstances.