Opinion filed January 31, 2019



In The

# Eleventh Court of Appeals

_____

## No. 11-17-00078-CR

_____

## EVANGELIA ANN MAYHALL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**

**Taylor County, Texas**

**Trial Court Cause No. 26783A**

### MEMORANDUM OPINION

The jury convicted Appellant of the first-degree felony offense of injury to a child and assessed her punishment at confinement for fifty years and a $5,000 fine. The trial court sentenced Appellant accordingly. In a single issue on appeal, Appellant contends that her sentence constitutes cruel and unusual punishment under the Constitution of the United States as well as the Texas Constitution. We affirm.

Appellant lived with her four-month-old daughter, A.M.; her six-year-old son, E.M.; her husband, James Mayhall; A.M.'s father, Justin Heiser; and Heiser's girlfriend, Breanna Morris. On January 4, 2016, first responders were dispatched to Appellant's residence in response to a call that there was an infant there who was not breathing. First responders found that A.M. was very malnourished, emaciated, lethargic, and appeared to be near death. The paramedic and the EMT who responded, Richard Stephen Sharp and Christopher Kyle McIver, transported A.M. to the hospital.

When A.M. arrived at the hospital, her temperature was at a critical low, she was dehydrated and mildly anemic, and her organs were beginning to shut down. A.M. stayed in the hospital for ten days, and while she was there, she gained over two pounds. When A.M. was discharged from the hospital, Child Protective Services placed A.M. and E.M. with a foster family, and A.M. recovered.

In her sole issue on appeal, Appellant contends that her sentence of confinement for fifty years constitutes cruel and unusual punishment based on the offense, her age, her need for rehabilitation, and other sentences for similar crimes in the same and other jurisdictions. We disagree.

The first responders testified that they had never seen anything like they saw when they saw A.M. They described A.M.'s appearance as one of the worst things that they had ever seen. Jennifer Hudgins, an investigator with the Department of Family and Protective Services, testified that A.M. did not look human and that she did not understand how anyone would let an infant get so close to death.

Dr. Leslie Marie Sharpe, the attending physician in the emergency room to which Sharp and McIver took A.M., testified that A.M. had a serious bodily injury: severe malnutrition. A.M. had folds in her thighs from malnutrition and did not have any fat on her body. Dr. Sharpe testified that, even in her work at a malnutrition

feeding center in Honduras, she had not seen any children with malnutrition that severe.

Dr. Amy McClatchy, A.M.'s pediatrician, testified that it would have taken around seventy days of food deprivation for A.M.'s organs to start shutting down and that the honey that Appellant put on A.M.'s pacifier is probably what kept A.M. alive. Dr. McClatchy also testified that a person would not have to have had medical experience to know that there was something wrong with A.M.; she was as near death as one could get.

The record contains evidence that Appellant did not appear to be concerned about A.M. During the 9-1-1 call that she made, Appellant said that A.M. was better; nevertheless, she requested that emergency personnel come and check on her. Upon arrival at the emergency room, although Appellant told Dr. Sharpe that she did not think anything was wrong with A.M. other than lethargy, she could not tell Dr. Sharpe when she had last fed A.M.

Even though Appellant claimed that she breastfed A.M., Detective Cati Wolfe of the Abilene Police Department testified that Appellant was "not leaking and [had not] complained or asked to go pump at all" during the four to five hours that Appellant was accompanied by officers after bringing A.M. to the hospital. Appellant testified that, prior to going to the hospital, she was not lactating.

Appellant had similar issues when she breastfed E.M. When E.M. had not gained enough weight, Appellant took him to a doctor and then supplemented breastfeeding with formula. Furthermore, she took E.M. to all his doctor appointments.

To the contrary, Appellant did not take A.M. to her pediatrician for checkups. Appellant admitted that she lied to Detective Adam Becker, the investigating officer, when she told him that she took A.M. to the doctor in November; that A.M. was healthy at that appointment; and that, at that appointment, the doctor told her not to

3

give A.M. formula because A.M. was doing so well. Even though she made a January appointment to take A.M. to the doctor and even though A.M. was clearly very ill, Appellant did not take A.M. to the doctor's office to be weighed or to find out whether A.M. was receiving adequate nutrition.

Appellant testified that A.M. started to appear thin at the end of December. Appellant thought that she stopped producing enough milk around Thanksgiving. However, even though Appellant could afford formula, she did not know why she did not buy any. She testified that A.M. went "steadily downhill" for four or five days but that she did not notice that A.M. had lost more than two pounds between September, when WIC personnel weighed A.M., and the date that first responders took A.M. to the emergency room. Although Appellant said that she was alarmed by A.M.'s appearance, she told Detective Becker that she had seen worse on "the National Geographic channel or something." She testified that her intent was not to hurt A.M. and that, if she had to do it all over again, she probably would have taken A.M. to Dr. McClatchy.

The first responders and the Child Protective Services Investigator testified that Appellant's residence smelled like urine, feces, and cigarette smoke and that the floor was covered in feces, trash, and clutter. McIver testified that he had not smelled any house worse than this one. Although there was no formula anywhere in the house, there was adult food, alcohol, and cigarettes; trash was everywhere. Child Protective Services took possession of A.M. and E.M. and later successfully obtained a termination of the parents' parental rights. At the time of trial, A.M. was doing well.

In our review of the record, we note that Appellant failed to object in the trial court that her sentence constituted cruel and unusual punishment. Therefore, Appellant has waived that issue on appeal. *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (failing to object at trial waives claim that sentence violates

4

the Texas Constitution's prohibition against cruel and unusual punishment); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (failing to make specific objection at trial waives a claim of cruel and unusual punishment under the United States Constitution).

Even if Appellant preserved the issue, the trial court did not abuse its discretion when it assessed Appellant's sentence. When we review a trial court's sentencing determination, "a great deal of discretion is allowed the sentencing judge." *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). We will not disturb a trial court's decision as to punishment absent a showing of an abuse of discretion and any harm that results from that abuse. *Id.* (citing *Hogan v. State*, 529 S.W.2d 515 (Tex. Crim. App. 1975)).

The Eighth Amendment to the Constitution of the United States provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. This provision was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 675 (1962). There is no significant difference between protection against cruel and unusual punishment under the United States Constitution and the protection against cruel or unusual punishment under the Texas Constitution. *Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997) (citing *Anderson v. State*, 932 S.W.2d 502, 509–10 (Tex. Crim. App. 1996)). When a sentence falls within the range of punishment provided by the legislature, it is generally not grossly disproportionate to the offense committed. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016). Here, Appellant concedes that her fifty-year sentence is within the statutory range of punishment for the first-degree felony of which she was convicted. *See* TEX. PENAL CODE ANN. § 12.32(a) (West 2011) (punishment for first-degree felony is five to ninety-nine years' imprisonment or life); *id.* § 22.04(e) (West Supp. 2018) (injury to a child is first-degree felony).

However, even if a sentence falls within the statutory punishment range, the sentence may violate the Eighth Amendment if the sentence is grossly disproportionate to the offense or to sentences in other similar offenses. *See Solem v. Helm*, 463 U.S. 277, 289–90 (1983). To determine whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime, we consider the severity of the sentence in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016) (citing *Graham v. Florida*, 560 U.S. 48, 60 (2010); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) (noting that the Supreme Court's holding in *Harmelin v. Michigan*, 501 U.S. 957 (1991), modified the gross-disproportionality test previously set out in *Solem*, 463 U.S. 277 (1983)). In the rare case in which this analysis leads to an inference of gross disproportionality, we compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Graham*, 560 U.S. at 60. If this comparative analysis confirms that the sentence is grossly disproportionate, the sentence is cruel and unusual. *Id.*

We conclude that the trial court did not abuse its discretion when it imposed a fifty-year sentence. The evidence showed that Appellant intentionally or knowingly failed to give A.M. enough food for a time so significant that A.M. was "about as near death as you could get"; she did not look human. Dr. Sharpe had never seen a case of malnutrition as severe as that suffered by A.M., not even in the malnutrition feeding centers in Honduras. Although there was a supply of adult provisions in the house, there was no formula for A.M., and A.M. did not receive sufficient nourishment from breastfeeding. Appellant did not appear concerned about A.M. when A.M. arrived at the emergency room. Even if Appellant did not waive error, her sentence, under this record, is not grossly disproportionate to this

offense. Consequently, we need not compare Appellant's sentence with the sentences received for similar crimes in this or other jurisdictions. *See id.* We overrule Appellant's sole issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


January 31, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.